(83 South. 232)

No. 22991.

WEMPLE v. PRODUCERS' OIL CO.

(March 3, 1919.  On Rehearing, Nov. 3, 1919.)

*(Syllabus by the Court.)*

MINES AND MINERALS ⟨⟩79(1)—ROYALTY PROVISIONS OF OIL LEASE ON CASING-HEAD GASOLINE.

Where, operating an oil well under an ordinary oil and gas lease, which entitles the lessee to all the oil produced and saved on the premises, less one-eighth, reserved to the lessor, and contains the usual provisions with respect to gas and water, the lessee claims and exercises the right, as springing from the lease, to use the vacuum pump process, as a result of which, and of the consequent lowering of the pressure and increased inflow of gas, the lighter constituents of the crude oil are resolved into vapor, which is brought up by the gas to the casing-head, whence it is led through coils of water-cooled pipes, the lower temperature of which superinduces the precipitation therefrom of casing-head gasoline, while the heavier constituents are brought up at the same time and through a tube inclosed in the same pipe, such lessee is in no position to deny to the lessor, as also springing from the lease, the same royalty upon the gasoline that he concedes upon the heavier constituents, which preserve their liquid form, unless he can show that the production of the gasoline involves greater expense, and less profit in proportion, than the production of such heavier constituents.

Appeal from First Judicial District Court, Parish of Caddo; R. D. Webb, Judge.

Suit by Barney Y. Wemple against the Producers' Oil Company, as assignee of an oil and gas lease.  Judgment for plaintiff, and he appeals.  Judgment annulled, and judgment rendered for plaintiff in a certain sum, with interest, etc.

E. W. Sutherlin, of Shreveport, E. P. Lee, of Mansfield, and Goldstein & Walker, of Shreveport, for appellant.

Hampden Story, of Shreveport, for appellee.

Statement of the Case.

MONROE, C. J.  Plaintiff, as sole owner and lessor of certain described tracts of land in the parish of De Soto, and as owner and lessor of an undivided half interest in certain other tracts, similarly situated, brings this suit against defendant as assignee of a certain "gas and oil lease" thereof, upon the following alleged cause of action, to wit: That defendant drilled 16 producing oil wells on the tracts of which petitioner is sole owner, and 8 wells on those of which he is part owner, and up to May 1, 1916, delivered to plaintiff his proportion of the oil produced and saved therefrom, as stipulated in the lease; that, on or about the date mentioned, defendant put into operation a device for the saving, by condensation, of certain oil emanating from said wells in the form of vapor, and has failed to account to plaintiff for his proportion of the same, as thus stipulated, to the value, as he is informed, of $12,000; that, in the event the court should hold that the product in question is not oil within the contemplation of the lease, he avers that it is a mineral, not embraced therein, of which he is the sole owner, or half owner, according to his rights in the lands from which such product is obtained, the value of which, as he is informed, exceeds $96,000; and that in the event the court should hold said product to be gas, and the wells to

be gas wells, he is entitled, under said lease, to $2,400 for each year, beginning on said May 1, 1916; and he prays for judgment accordingly, as the court may find.

The contract sued on (under which defendant holds, through mesne assignments, from the Busch Everett Co., original grantee) contains the following stipulations, pertinent to the present inquiry to wit:

"B. Y. Wemple, * * * the party of the first part, in consideration of the sum of $78.00, paid by * * * the party of the second part, * * * do (does) by these presents grant, bargain, sell, and convey unto the said party of the second part * * * all of the oil and gas in and under the following described land, together with the right of ingress and egress, at all times, for the purpose of drilling, mining, and operating for gas, oil, or water, and to conduct all operations to erect storage tanks and other necessary structures, and to lay all pipes necessary for the production, mining, and transportation of oil, gas, and water, with the right to use sufficient water, gas or oil to operate said property, and shall have the right to remove all machinery, fixtures, and improvements placed thereon at any time; reserving, however, to the party of the first part the equal one-eighth of all oil produced and saved upon said premises, to be delivered in any pipe line to which (any) well or wells may be connected, to the credit of the party of the first part.

"If gas is found, second party agrees to pay first party $200.00 for the product each year, payable quarterly, for the product of each well, while the same is being used off the premises; said party of the first part, by furnishing his own pipe and connections, shall have sufficient gas, free of cost, for use in one dwelling house on the preimses, so long as the gas is utilized off the premises, at his own risk. * * * Said land being of the following description, to wit: [Then follows description of the land and certain other provisions which need not be here quoted]."

Defendant, by way of answer, admits that it has drilled six producing wells on the tracts claimed by plaintiff in full ownership, and four such wells on the tracts claimed in half ownership; that on July 19, 1916, it put in operation "a device, or plant, for the saving of the oil known as 'casing-head gas,' being gas saturated with volatile oil, whereby the said volatile oil was condensed, and is being condensed, into a liquid "form"; but it denies that any accounting is due to plaintiff for such oil, and alleges that, under the contract sued on, it is the property of defendant, in which plaintiff has no interest.

"Defendant, further answering herein, shows that, at the time of the execution of the lease referred to in plaintiff's petition * * * there was no practical way in which the saving of oil in volatile condition, in gas known and designated as 'casing-head gas,' escaping from oil wells, could be commercially or profitably utilized, but that at such time such 'casing-head gas' had no value, except that part of it which could be used in the operation of the leased premises, as permitted by the lease, * * * the escaping of the remainder without profitable use to any one being unavoidable; and that not until recently have processes become perfected to the point where any operator may, with any reasonable possibility of profit, engage in the enterprise of manufacturing gasoline from 'casing-head gas,' or oil held in a volatile condition in gas escaping from oil wells, and as yet such business is in the state of Louisiana largely in the experimental stage."

Further alleges that it installed a compressing plant, or factory, on the leased premises, for the manufacture of gasoline from "casing-head gas," at a cost of $14,174.-52, and a vacuum plant at a cost of $4,624.25, and installed a blending plant at South Mansfield, for the blending and treatment of the gasoline manufactured from the "casing-head gas," obtained from the wells on the lands leased from plaintiff, and from the wells on other lands held under lease by it, at a cost of $16,059.23, and expended other sums for pipe lines, loading racks, boiler stations, equipment, and things necessary for the saving of the said casing-head gas, its manufacture into gasoline, and its blending so as to make it fit, as required by law, for sale, commercial use, shipment, and transportation, to the amount of $19,146.78.

It alleges that plaintiff is entitled (if to anything) to but one-eighth of the casing-head gas taken from the wells drilled on the

lands of which he claims full ownership, and one-sixteenth of that taken from the wells drilled upon the lands of which he claims half ownership, from July 19, 1916, to April 30, 1917, inclusive, amounting in value, at 4 cents per 1,000 cubic feet, to $77.72; that, should the court hold that he is entitled to the proportions claimed by him of the gasoline, manufactured from casing-head gas, there should be first deducted "the cost of installing, maintaining, and operating the plants heretofore mentioned, including the blending plant at South Mansfield, and all costs incidental and complementary to the storage, preservation, transportation, and sale of said gasoline."

To the defense so set up plaintiff filed a plea of estoppel, by judicial admission, to which we shall refer more particularly in the opinion which follows this statement.

According to our understanding of the evidence, the drilling of the wells here in question, and the operations by which the oil vapor is condensed and precipitated, as gasoline, from the casing-head gas, is about as follows: An 8-inch pipe, called "casing," is sunk to a depth of from 250 to 350 feet, at which depth the lower end is set in cement; a 6-inch pipe, also called "casing," is then sunk inside of the 8-inch pipe, and further down, through the earth, to a depth of, say, 2,000 feet, at which depth its lower end is also set in cement; a 4½-inch pipe is then sunk, inside of the 6-inch pipe, from a point, say, 30 feet above its lower end, and lower down, through the earth, to and into the oil sand, where its lower section is perforated to admit the oil; a 2-inch tube is then lowered inside of the 4½-inch pipe, and its lower section is similarly perforated; a "sucker rod," with valves on the lower end, is then put down through the tube; the upper ends of the tube and two smaller pipes, rising to the same level, are capped, hermetically, and the 8-inch pipe being cut off a little lower down,

the space between it and the 6-inch pipe is similarly capped; and the cappings, respectively, are called "casing-heads."

The pumping operation of the sucker rod creates a vacuum about the lower end of the tube, superintending an inflow to the tube of the oil, and of such gas as it may contain, lowering the pressure upon the oil, and thereby causing the expansion of its lighter constituents into vapor, which, taken up by the gas, is carried to the casing-head through, first, the space between the tube and the 4½-inch pipe, and then the space between the tube and the 6-inch pipe; and from the casing-head the vapor-laden gas is let out, by means of a valve, into a pipe through which it is conducted to the condenser, where it is passed through coils of water-cooled pipes, with the result that the vaporized oil is precipitated and comes out "casing-head gasoline," and the gas, thus relieved of it, is made fit for consumption; the heavier constituents of the oil in the well being, in the meanwhile, carried up through the tube, and similarly let out through the casing-head into a pipe which delivers it into a tank or elsewhere, as may be found expedient.

The examination of J. C. McCue, defendant's general superintendent for its North Louisiana division, in complete charge of its operating department (under a chief supervisor, whose office is in Houston, Tex.), reads, in part, as follows:

"Q. Now, in saving the gasoline from the casing-head gas, it is condensed by pressure, and the gasoline is precipitated from the casing-head gas by the compression of the casing-head gas? A. Yes, sir."

"Q. You have never accounted to Mr. Wemple for that part of the oil? A. No, sir; there was no settlement made with him for it. * * * Q. Do you know what is done with the gas after you extract the gasoline from it—that comes from the casing-head gas on the Wemple lease? A. I could not answer that question. Q. Do not they use it for fuel? A. In some cases they do, but I do not know whether they do or not on the Wemple lease. Q. Do you give it away

to any one? A. No, sir. * *. * Q. Is not pure casing-head gasoline, as it comes from the casing-head plant, worth more than commercial gasoline? A. I don't know. Q. To whom did you sell casing-head gas [oline]? A. To the Texas Company. A. That is the same as the Producers' Oil Company? A. I expect it is; I don't know. Q. What does the Texas Company get for it? A. I don't know. At their wagon, they get 23 cents. Q. Do not they mix the casing-head gasoline and cheap kerosine and sell it as gasoline? A. I don't know. * * * Q. How is this casing-head gasoline produced; what causes it in an oil well? A. I don't know, but it is there. * * * Q. Now, when you take this casing-head gas through this well, what becomes of it? A. It goes into the vacuum plant—to the cylinder of the vacuum plant. Q. Is that what they call the compressor? A. *No, sir; it is the vacuum pump. Q. And where does it go from the vacuum pump? A. Into the receptacle. Q. What does the compressor do with that gas? A. Pumps it into the coil, and from there it precipitates the gas. Q. How is that precipitation done? A. Well, it is done by going through the coils and cooled off. Q. How is it cooled? A. Water running on it.* Explain that. A. I am not much of a gasoline man; you have a gasoline man here. * * *"

Witnesses, professing to know something about gasoline, were examined, but no other testimony concerning the method by which defendant extracts that commodity from casing-head gas was adduced. We must therefore regard the testimony last above quoted, of the man who is in complete charge of defendant's operating department, as conclusive upon that subject, and as correcting his first statement, to the effect that the gasoline was obtained by compression.

The witness testifies, at one time, that he took casing-head gas (into the Wemple plant) from no other wells than those in which Wemple is interested; but he furnished a statement showing that he also took it from wells in land owned by another person (Saunders), in which Wemple is not interested. According to the statement, out of a total of 177,310 gallons of gasoline, produced through the Wemple plant (between July 19, 1916, and April 30, 1917), 72,169.24 gallons are attributed to gas from wells upon lands owned wholly by Wemple; 47,876.40 gallons to gas from wells on lands of which Wemple is part owner; and 57,274.36 gallons to gas from wells on land owned by Saunders. The witness further testifies that the "vacuum plant and condenser," otherwise referred to as the "gasoline plant, the vacuum plant, and the blending plant, at South Mansfield, cost the amounts stated in the answer; that the gas well costs $9,775.75; and the "discharging line" $8,914.12, and that there were other expenses; but neither he nor any other witness explains the connection between those items of cost and the separate and distinct expense, whatever it may have been, or may be, incurred in the extraction of the casing-head gasoline from the casing-head gas. It is undisputed that the vacuum pumps produce more oil than can be produced by any other pumping process, and the evidence justifies the conclusion that it would have been installed upon the Wemple place for the purpose of increasing the petroleum product and without reference to the production of casing-head gasoline.

The testimony fully sustains the view that casing-head gasoline is quite as valuable, and perhaps more valuable, than the commercial article, consisting of casing-head gasoline blended with cheaper products, such as naptha and kerosine.

It is not disputed that there are but six producing oil wells on the land owned wholly by plaintiff, and four on the land owned by him in indivision with a Mr. Nabors. It seems also to be undisputed that defendant began saving casing-head gasoline on July 19, 1916.

In a bulletin concerning the production of natural gas in 1911, issued by the Department of the Interior in 1912, and offered in evidence on behalf of defendant, we find the following (pages 45 and 46):

"There are two recognized methods of taking gasoline from gas. Some gases will not yield

gasoline without being compressed under high pressure; other gases will make gasoline simply by cooling, without any compression whatever. In addition to the fully equipped compressor plant, there is the simple and inexpensive method called the gas pump, or vacuum, process. It is said that some of these pumps have been producing gasoline in the vicinity of Tidiout, Pa., for 40 years; but the gasoline was not sold, or even saved, until about 12 years ago (1899). Since 1910 the producers at that place have manufactured it successfully. * * * By the vacuum process the gas goes through the pump and is discharged against a pressure of five ounces. No particular machinery is required to obtain the gasoline, it being necessary to run those pumps in connection with the oil-producing part of the business. After the gasoline is extracted from the gas, the latter is usually delivered back to the original producer, and is used to pump the oil wells from which it first came. * * *

"*Royalty on Natural Gasoline.*—A point of great interest to the natural gas operator has arisen in connection with the forms of leases in cases where part of the gas is used for extracting gasoline. Leases drawn at this time provide for a royalty on the gasoline if the gas is used for its extraction, but in the old leases the working interest is generally required to pay for gas only. Some companies secure gasoline from casing-head gas obtained by pumping oil from old wells with a strong vacuum. The gas goes to operating the oil pumps. The landowners receive one-eighth of the net proceeds from the gasoline after operating expenses of the plant are deducted. Further comment on the general practice in this matter will be made in the report for 1912."

The report for 1912 does not appear to have been produced, but the report for 1913 ("11; 34. Department of the Interior—U. S. Geological Survey, George Otis Smith, Director. The Production of Natural Gas in 1913") is in evidence, and we make the following excerpt therefrom (pages 1478, 1479):

"The extraction of gasoline from casing-head gas (natural gas from oil wells) has become one of the important adjuncts of the natural gas industry in the United States. Statistics of the production of this kind of gasoline have been collected for the last three years, the results of which will be found in the tables which follow: * * * It will be seen that the production is increasing rapidly, the quantity produced in 1913 being almost double that of 1912. This increased production was due to the installation of a greater number of plants and to an advance in the price of gasoline. A description of the processes employed in the extraction of gasoline from natural gas was given in the report for the year 1911, and need not be repeated further than to say there are two methods in use—one, the regular compressor plant; the other, the gas pump, or vacuum, process. * * * The total quantity of gasoline produced in 1913 amounted to 24,060,817 gallons, valued at $2,458,443, an average price of 10.22 cents per gallon. * * * The majority of the compressor plants are erected near the oil wells by the owners or operators of the wells from which they are to receive their supply of gas, but in many cases these operators also buy gas from neighboring oil wells. Gas is usually purchased on a royalty basis; that is, on a certain proportion of the gasoline produced, or of the proceeds of the sales from the gasoline, royalties ranging from one-fourth to one-third, to three-eighths, and to one-half. Gas is also purchased at so much per well per month, or at so much per 1,000 cubic feet, the price ranging from 2 to 10 cents. The residue or exhaust gas is usually returned to the producer," etc.

In the "Bulletin 88," "Petroleum Technology 20," issued in 1916, and entitled "The Condensation of Gasoline from Natural Gas," we find the following concerning the origin and composition of casing-head gasoline (pages 26, 27), to wit:

"When a gas bubbles through or comes into contact with a liquid, it takes up and carries along vapor or minute particles from that liquid. The proportion of vapor increases as the temperature rises, and is quite independent of the nature of the gas, as long as no chemical action takes place. When a natural gas in the earth comes into contact with petroleum, those fractions of the petroleum having the lower boiling points are principally taken up, inasmuch as their vapor pressure is much higher than those of the other fractions. If the well is under reduced pressure, products with higher boiling points will also be removed in the gas. The vapors are carried with the gases mentioned in the same manner that water vapor exists in air."

### Opinion.

The contract here in question having originally been entered into in 1909, it seems reasonably certain that neither of the then

contractants considered, or knew of, the possibility of profitably extracting gasoline from casing-head gas, and it is quite certain that they included no specific provision relating to such gasoline in their contract. It is equally certain, we think, that plaintiff had no information upon that subject in 1914, when the contract was taken over by defendant; but it seems improbable that a corporation such as the Texas Company, of which defendant is said to be merely a subsidiary, and which for years has been reputed as possessed of immense resources, and as being among the most active and successful operators of oil properties in this country, should not then have possessed what had become common knowledge concerning that business. It is immaterial, however, for the purposes of this case, whether it was so possessed or otherwise, since it took the contract as it found it; and, as plaintiff knew no more at that time than he did five years before about casing-head gasoline, there was, and could have been, no special understanding or agreement between him and defendant concerning that product. Subject to the conditions therein expressed, however (i. e., that wells should be drilled; that there should be reserved to plaintiff "the equal one-eighth of all oil produced and saved on the premises"; or, where the wells produced gas, that there should be paid "$200 for the product each year, payable quarterly, for the product of each well," while the same is being used off the premises, etc."), the contract conveyed to defendant—

"all of the oil and gas in and under the * * * land, together with the right of ingress and egress, at all times, for the purpose of drilling, mining, and operating for gas, oil, or water, and to conduct all operations, to erect storage tanks and other necessary structures, and to lay all pipes necessary for the production, mining, and transportation of oil, gas, or water, with the right to use sufficient water, gas, or oil to operate said property," etc.

Nothing appearing in the contract about casing-head gas, or gasoline, or the extraction of the one from the other by means of a plant erected on the surface of plaintiff's lands, of which defendant had thus been accorded the use, for specified purposes, it would not, perhaps, have been surprising, as defendant offered no additional compensation for such unspecified and (to plaintiff) unexpected use, if plaintiff had demanded such compensation by suit; nor would it have been altogether surprising if defendant, placing on the contract the interpretation most favorable to itself, for the defense of such suit, had set up that it had thereby acquired the right to produce and save all the oil and gas that was to be found in or under the land, with no restrictions as to the appliances that it might require for those purposes, and that the plant was to be used in the exercise of that right. The suit, as instituted, was not, however, predicated upon any denial of such right. The petition first alleged that defendants' assignor arbitrarily, unnecessarily, and in disregard of petitioner's rights destroyed about two and a half miles of his fencing, thereby throwing open 200 acres of cultivated and pasture land and depriving him of the use of it; and that defendant became responsible therefor by virtue of the compromise and agreement whereby the contract was assigned to it; and it then alleged as follows (quoting in part):

"That * * * the said * * * company constructed a plant or device for the saving of oil produced in a vaporous form from the oil wells on said premises, and, without petitioner's consent and without any right or authority, has laid pipe lines across said lands * * * for conveying * * * thereto oil produced in vaporous form from oil wells situated on lands belonging to other persons adjacent to, or in the vicinity of, petitioner's land; that said plant * * * has been used, not only in the saving of oil from oil wells on petitioner's premises, but in the saving of oil * * * conveyed to it from oil wells situated on the lands of others; and that, therefore, said defendant is liable to petitioner (a) for the laying * * * of said pipe line across petitioner's said land; and (b) for rental of the land so occupied by said plant * * * in so far and to such extent as the

same has been and is used and operated for the saving of oil produced in vaporous form from oil wells located on the lands of others; and, for these causes and on these grounds, plaintiff demands further judgment against said defendant at the rate of $50 per month," etc.  *  *  *

"That  *  *  *  defendant,  *  *  *  without petitioner's consent, and without any right,  *  *  *  has laid two cable lines, on stilts, about three feet above the surface of the ground, and extended each of said cable lines from said pumping plant about one-half mile across petitioner's said land, in order that oil wells located on the lands of others might be pumped from said plant;  *  *  *  that said cable lines  *  *  *  are constantly kept moving backward and forward from said central pumping plant, and constitute a dangerous situation, depriving petitioner of the free use of said lands;  *  *  *  that said defendant is therefore liable to petitioner (a) for laying and constructing said cable lines,  *  *  *  and for rental of the lands so occupied," etc.

In the answer filed by defendant to the petition thus quoted it denies liability for rent of the land occupied by its plant, machinery, and appliances, on the ground that the lease executed by plaintiff, of which it is the assignee, confers upon the lessee—

"the right  *  *  *  to occupy said leased premises and to conduct all operations thereon; to erect storage tanks and other necessary structures, and to lay all pipe lines thereon necessary for the production, transportation, and mining of all oil, gas, and water, with the right to use sufficient water, gas, or oil to operate said property, reserving to the plaintiff a royalty of all oil produced or saved (meaning crude petroleum) on said premises; that, under the provisions of said lease, defendant had the right  *  *  *  to erect and install said plant for the manufacture of casing-head gas into gasoline, and the central plant, or device, for pumping,  *  *  *  and to occupy such portions of the leased premises as was reasonably necessary to the carrying on of operations under said lease, to save and utilize said casing-head gas, oil, or gas from wells on said premises, and for any other purpose  *  *  *  which might be complimentary, incidental, or needful to reasonably and adequately carry on the development of said leased property according to the true meaning, intent, purport, and tenor of said lease, to the best advantage and benefit of itself and the plaintiff;  *  *  *  that the construction of said works, instead of being a damage, loss, annoyance, or danger,  *  *  *  was and is of great benefit, advantage, and profit to said plaintiff,  *  *  *  inasmuch as, for a long time,  *  *  *  the said casing-head gas, being gas saturated with volatile oil, in vaporous condition,  *  *  *  was a complete and total loss and waste; that such loss was incidental in the operating of oil wells and unavoidable; that the erection of said plant for the compressing and saving of said casing-head gas and the pumping station  *  *  *  to operate the wells on the leased premises  *  *  *  was necessary to the development of said leased premises, and further made it possible for  *  *  *  this defendant to save said casing-head gas, and to increase the production of oil (crude petroleum) from said wells by the system of applying vacuum to said wells;  *  *  *  that should it be decreed that it had no right to place said condensing plant  *  *  *  on the leased premises to carry on operations for the development of oil and gas, and the saving of said casing-head gas, and that such right did not come within the purview and meaning of said lease, then it avers that, if it should be compelled to remove said plant, or pumping plant, and discontinue the operation of such plants, such removal, or cessation of operations, would cause the wells on plaintiff's land to cease to produce oil, and also would cause the oil and gas under the land of plaintiff, upon which the defendant is operating,  *  *  *  to be drained by wells on adjoining lands, to the great loss and injury of the defendant as well as to plaintiff."

It will be seen, therefore, that, in the suit thus referred to, while plaintiff virtually concedes that defendant has the right, by virtue of the lease, to maintain and operate a plant for the extraction of gasoline from casing-head gas emanating from oil wells on his lands, he does not specially put at issue the question of his right to a royalty from that product. It will also be seen that defendant takes the rather difficult position in that suit that though it is entitled, by virtue of the lease, to create a vacuum at the bottom of an oil well, by reason whereof, and of the ascending gas, a portion (that is to say a certain constituent) of the oil is evaporated, and brought with the gas to the surface, and though, by virtue of the lease, it is entitled there to condense it, or allow it to condense, and again become a liquid, it (defendant) thereby incurs no ob-

ligation with respect to any royalty reserved by the lease to the owner of the land. In other words, that while gasoline obtained from casing-head gas is oil, within the terms of the lease, in so far as defendant's right to produce and save it "on the premises" is concerned, it is not oil within the meaning of that provision of the lease whereby one-eighth of all the oil so produced and saved is reserved to the owner. And, such having been the position taken by defendant in that case, we do not find that it is estopped to take it in this case, though whether it can be here maintained is another question.

.It will further be seen that though, in the case thus referred to, defendant makes the judicial assertion that the plant, appliances, etc., which plaintiff there alleges were extrinsic to the lease, and therefore subject to a rent charge, were absolutely required by the lease, as the means of increasing the production of petroleum and of preventing plaintiff's lands from being drained of that mineral, it contends in this case, with equal earnestness, that the cost of that plant and appliances and many other charges, including operating expenses, should be charged against the casing-head gas and gasoline account.

Considering the different positions thus assumed by defendant, in the light of the law and of the principles of equity which we conceive to be applicable to the case, we premise by saying that we find nothing in this record which seems to impair the doctrine that no one is presumed to give, and hence nothing to warrant the belief that it was within the contemplation of the contract between plaintiff and defendant that defendant should be allowed to take more than $20,000 worth of gasoline (valued at about half the market price) from plaintiff's land, within a period of less than ten months, or any other product of value, and give nothing in return.

That instrument, as we take it, is to be interpreted as have been others of greater importance, and all rights claimed by the grantee which are not conferred, in direct terms or by fair implication, from those which are so granted, are to be considered withheld. The right to drill and operate wells is conferred in direct terms, and, as there is no restriction placed upon the method of operating, it is to be assumed that it was the intention that they should be operated by the method best calculated to accomplish the purpose for which the contract was entered into, to wit, that which would result in the production of the greatest quantity of oil or gas, or both; and, as the vacuum pumping process is shown to meet that requirement, defendant was within its rights in adopting that method. The purpose of the contract was, however, confined to the production of oil and gas; and in conveying to defendant, subject to the reservations and conditions expressed in the contract, all of those minerals that might be produced and saved on or off the premises, plaintiff, as owner of the land, conveyed nothing else that defendant, in the exercise of its right to drill and to make use of the surface of the land, for oil and gas purposes, might produce therefrom or find therein or thereon. So that, if casing-head gas be neither oil nor gas, within the meaning of the contract, defendant is not entitled to it, or any part of it, whether by virtue of the contract or otherwise. If regarded only as gas, plaintiff is entitled to nothing by reason of its production unless it be sold off the premises; but, if it be regarded as oil, one-eighth of it is reserved to him by virtue of the contract; and, if it be regarded as a combination of oil and gas, he is entitled to the one-eighth of the oil, plus the gas rental stipulated in the contract, should it be shown that the gas is being used off the premises. Mr. McCue, though defendant's general superintendent in complete charge of its operations

in North Louisiana, subject only to the supervisor in Houston, testifies that he does not know what disposition is made of the casing-head gas after the precipitation of the gasoline, and defendant called no witness who gave any information on that subject. We must therefore assume, for the purposes of this case, that no gas is used off the premises, and hence that plaintiff is entitled to nothing on that account. As will be gathered from the statement of the case, the difference between a well which produces oil without casing-head gas (if there is such a well) and one which produces both oil and gas is that in the one case the oil is brought up through a single tube as a whole, with all of its constituent elements together, and in the other the heavier constituents are brought up through a two-inch tube, while the lighter ones, taken up by the gas, ascend through the pipes in which the tube is inclosed. It is true that the lighter constituents do not come up in the form of oil, but both litigants assert that the liquid into which they are converted (or convert themselves merely by reason of their subjection to a lower temperature) is produced and saved, on the premises, from the lighter constituents of the same oil which it is the purpose of the contract to produce and save, and the heavier and remaining elements of which are brought up in liquid form, from the same well, at the same time, and through a tube inclosed in the identical pipes which bring up the vaporized lighter elements. So far as we can see, there is nothing to prevent the owner from selling to one person the right to take such oil as he can bring to the surface in liquid form, and to another that portion of the same oil that can be brought up only in a state of vapor; nor do we see any reason why a lessee who enjoys and exercises the right to take all of the constituents of the oil—the heavy and light—should not pay the price for what he takes.

Such, in effect, is the view expressed by the Supreme Court of West Virginia in Locke et al. v. Russell et al., 75 W. Va. 602, 84 S. E. 948, where it is held that an operator, producing gasoline from casing-head gas, though not (necessarily) liable for gas rental, is liable to the owner for his share of the gasoline, as embraced within the stipulation of the lease reserving such share of the oil to be produced. To the argument that the lessee is under no obligation to deal in any way with the casing-head gas, and that, unless he extracted the gasoline, it would be a waste product, the answer is that, if the casing-head gas is not included among the products to which the lessee is entitled by virtue of the lease, the question whether it is wasted or saved is one which concerns the lessor alone, but that if, in such case, the lessee chooses so to treat the gas as to save both the gas and its gasoline contents, the owner is entitled to be benefited thereby, whether upon the basis of the contract as to the oil, or upon some other basis. If the treatment of the casing-head gas were shown, in this case, to involve an expense greater in proportion to the value of the product than that incurred in the production and handling of the oil, it would perhaps be proper to increase the allowance to the operator in a like proportion; but no such showing has been made. To the contrary, the main expense which has been testified to is that which is necessarily incurred in the production and saving of the oil, and in the treatment of the gasoline off the premises, at the blending plant; the additional expense of precipitating the gasoline, by merely passing the casing-head gas through water cooled coils, being apparently trifling, and more than compensated by the greater value of the product.

We conclude, then, that plaintiff is entitled to recover upon the basis of an allowance of a one-eighth interest in the casing-

head gasoline produced between July 17, 1916, and April 30, 1917, inclusive, from the six wells on land of which he is sole owner, and on one-sixteenth interest in that so produced from the wells on lands in which he owns an undivided one-half interest, the total production in the one case being 72,169.24 gallons, of which the one-eighth is 9,021 gallons, and the total, in the other case, being 47,876.40 gallons, of which the one-sixteenth is 2,992 gallons. As a medium between 15 and 23 cents, as shown by the testimony, we find the value at which defendant should account for the gasoline to be 18 cents a gallon.

It is therefore ordered and adjudged that the judgment appealed from be amended, in accordance with the views expressed in the foregoing opinion, and that accordingly there now be judgment in favor of plaintiff and against defendant for the aggregate sum of $2,149.44, with interest thereon from judicial demand until paid and costs.

### On Rehearing.

SOMMERVILLE, J. The rehearing in this case was restricted to the question of the basis upon which plaintiff should be allowed to recover from defendant All other questions in the case were disposed of in the original opinion of the court.

After further argument on both sides, oral and printed, and upon further examination of the matter, we have concluded that the basis adopted by the court in the original opinion on the case upon which plaintiff should recover is correct, and it will not be changed.

The comparatively small expense, as shown in the record, for machinery used by defendant in saving casing-head gasoline, would not warrant us in charging the owner with any part thereof.

The former opinion and decree of the court are reinstated, and they are made the opinion and decree in the case.