## GILBREATH v. STATES OIL CORPORATION.*

(Circuit Court of Appeals, Fifth Circuit. February 5, 1925.)

No. 4230.

1. Mines and minerals ⊙⟹73—Courts, construing oil and gas lease, may notice condition and development of petroleum industry when lease was made.

Courts, construing oil and gas lease, are entitled to notice condition and development of petroleum industry when lease was made.

2. Mines and minerals ⊙⟹79(3)—Casing-head gas, or gasoline derived therefrom, held part of oil, rather than natural gas, within meaning of oil and gas leases.

Casing-head gas, or gasoline derived therefrom, held part of oil, a one-eighth royalty of which had been reserved, rather than natural gas within meaning of lease, which contained no specific reference thereto.

In Error to the District Court of the United States for the Northern District of Texas; James Clifton Wilson, Judge.

Suit by T. J. Gilbreath against the States Oil Corporation. Judgment of dismissal, and plaintiff brings error. Reversed, motion to dismiss overruled, and case remanded.

R. N. Grisham, of Eastland, Tex. (Grisham Bros., of Eastland, Tex., on the brief), for plaintiff in error.

O. C. Funderburk, of Eastland, Tex. (Scott, Breslford, Funderburk & Ferrell, of

*Rehearing denied March 27, 1925. Certiorari denied 45 S. Ct. 639, 69 L. Ed. ——.

Eastland, Tex., on the brief), for defendant in error.

Before WALKER and BRYAN, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge. On May 17, 1917, complainant executed in favor of respondent's assignor a mineral lease upon certain lands in Eastland county, Tex., which, in addition to conveying the right to explore and produce mineral oil, contained the following provisions pertinent to the present suit, to wit:

"(2) To pay the lessor $200 each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time, by making his own connections with the wells at his own risk and expense.

"(3) To pay lessor for gas produced from any oil well and used off the premises at the rate of $25 per year for the time during which such gas shall be used, said payments to be made each three months in advance."

The bill in this case alleges that the defendant has produced from said land a large quantity of what is known to the trade as casing-head gas or gasoline, which the "lease does not grant," but was and is owned by complainant, and that respondent had unlawfully appropriated the said casing-head gas and casing-head gasoline to its own use and benefit. Plaintiff prayed for an accounting and for judgment for the value of said products. . In the alternative, if found not to be the owner of said casing-head gas and gasoline, petitioner alleged that he is entitled to be paid a reasonable royalty thereon under said lease, of say 25 per cent., and further, in the alternative, that, if the casing-head gas and gasoline is held to be oil within the meaning of said contract, he is entitled to receive a one-eighth royalty therein, as provided in the contract. The lease was attached to and forms part of the petition.

The suit having been brought in the state court for Eastland county, Tex., was, on the petition of respondent, removed to the United States District Court for the Northern District of Texas upon the ground of diverse citizenship. Thereupon respondent moved to dismiss, for the reason that the bill disclosed no right of action, which motion was by the court sustained, and the bill dismissed. Complainant prosecutes this appeal.

Complainant takes the position, first, that, since the lease does not mention casing-head gas or casing-head gasoline, same was not covered by the contract, and is therefore a product not conveyed, but title thereto remains in the lessor; second, that, if conveyed, he is entitled to receive a reasonable royalty, and, third, in the alternative, that these products fall within the term "oil," and he should receive the stipulated royalty of one-eighth. On the other hand, the defendant contends that, since casing-head gas and gasoline are extracted from gas, they must be treated as a part of the gas, and as covered by the provisions for payment therefor.

The solution of these issues requires a consideration of the terms of the contract, in the light of conditions as they existed at the time, and as to what was reasonably in the minds of the parties as expressed therein. Until recent years the generally recognized uses of natural gas were for light and fuel, making carbon black, and sometimes, where the pressure was sufficient, in place of steam for operating pumps in the field.

It is argued by respondent that by the lease in this case the parties endeavored to provide a basis of compensation for the use of gas in all circumstances, because, instead of containing alone the usual clause for the payment of so much per year "where gas only is found while the same is being used off the premises," there is a second and further provision fixing a definite price where gas is "produced from any oil well and used off the premises," the compensation in the latter case being only one-eighth of that in the former, and hence it must be considered that the parties had in mind that, inasmuch as gas might be used from an oil well, it would be for the purpose of producing casing-head gas or gasoline. However, as pointed out by complainant, the words "casing-head gas and casing-head gasoline" are nowhere mentioned in the lease.

[1] We think the courts are entitled to take notice of the condition and development of the petroleum industry. With the invention and improvement of the internal combustion engine, it has assumed an importance, especially as to the production of petroleum gas or gasoline, second to none as a source of mechanical power. Yet the means used for extracting that power in this instance has only been developed within recent years, principally in the past decade. As a matter of fact, even at the time this lease was made, on April 2, 1917, its value had not been fully appreciated by the operators, and we think it reasonable to assume that laymen, such as the lessor in this case,

had no knowledge of it; otherwise, self-interest would naturally have induced him to exact a reasonable return for the conveyance of such a valuable right.

On the contrary, if the argument of defendant is sound, that the second clause quoted above is intended to cover the production of casing-head gas and gasoline, because they are produced only from an oil well, the lessor deliberately consented to accept therefor only one-eighth of what he was exacting for natural gas alone, notwithstanding the latter was of a much less value. We do not believe we are justified in attributing to complainant any such purpose. What we believe was reasonably contemplated was that the price mentioned should be paid for the use of gas off the premises for ordinary and well-known purposes of fuel, heat, etc., and that the reason for stipulating a greatly reduced price in case it was used from an oil well was that the parties recognized that a paying oil well would produce smaller quantities of gas.

As bearing upon the question as to whether or not the parties had in mind the production of casing-head gas or gasoline, we quote from a bulletin issued in 1912 by the Department of the Interior for the year 1911:

"There are two recognized methods of taking gasoline from gas. Some gases will not yield gasoline without being compressed under high pressure; other gases will make gasoline simply by cooling, without any compression whatever. In addition to the fully equipped compressor plant, there is the simple and inexpensive method called the gas-pump, or vacuum, process. It is said that some of these pumps have been producing gasoline in the vicinity of Tidiout, Pa., for 40 years; but the gasoline was not sold, or even saved, until about 12 years ago (1899). Since 1910 the producers at that place have manufactured it successfully. * * * By the vacuum process the gas goes through the pump and is discharged against a pressure of five ounces. No particular machinery is required to obtain the gasoline, it being necessary to run those pumps in connection with the oil-producing part of the business. After the gasoline is extracted from the gas, the latter is usually delivered back to the original producer, and is used to pump the oil wells from which it first came. * * *

"*Royalty on Natural Gasoline.*—A point of great interest to the natural gas operator has arisen in connection with the forms of leases in cases where part of the gas is used for extracting gasoline. Leases drawn at this time provide for a royalty on the gasoline, if the gas is used for its extraction; but in the old leases the working interest is generally required to pay for gas only. Some companies secure gasoline from casing-head gas obtained by pumping oil from old wells with a strong vacuum. The gas goes to operating the oil pumps. The landowners receive one-eighth of the net proceeds from the gasoline after operating expenses of the plant are deducted. Further comment on the general practice in this matter will be made in the report for 1912."

We also quote from the report by the said Department for the year 1913 (Department of the Interior, U. S. Geological Survey, George Otis Smith, Director):

"The extraction of gasoline from casing-head gas (natural gas from oil wells) has become one of the important adjuncts of the natural gas industry in the United States. Statistics of the production of this kind of gasoline have been collected for the last three years, the results of which will be found in the tables which follow: * * * It will be seen that the production is increasing rapidly; the quantity produced in 1913 being almost double that of 1912. This increased production was due to the installation of a greater number of plants and to an advance in the price of gasoline. A description of the processes employed in the extraction of gasoline from natural gas was given in the report for the year 1911, and need not be repeated, further than to say there are two methods in use—one, the regular compressor plant; the other, the gas pump, or vacuum, process. * * * The total quantity of gasoline produced in 1913 amounted to 24,060,817 gallons, valued at $2,458,433, an average price of 10.22 cents per gallon. * * * The majority of the compressor plants are erected near the oil wells by the owners or operators of the wells from which they are to receive their supply of gas, but in many cases these operators also buy gas from neighboring oil wells. Gas is usually purchased on a royalty basis; that is, on a certain proportion of the gasoline produced, or of the proceeds of the sales from the gasoline, royalties ranging from one-fourth to one-third, to three-eighths, and to one-half. Gas is also purchased at so much per well per month, or at so much per 1,000 cubic feet, the price ranging from 2 to 10 cents. The residue or exhaust gas is usually returned to the producer," etc.

We again quote from "Bulletin 88, Petroleum Technology 20," issued in 1916, entitled

"The Condensation of Gasoline from Natural Gas":

"When a gas bubbles through or comes into contact with a liquid, it takes up and carries along vapor or minute particles from that liquid. The proportion of vapor increases as the temperature rises, and is quite independent of the nature of the gas, as long as no chemical action takes place. When a natural gas in the earth comes into contact with petroleum, those fractions of the petroleum having the lower boiling points are principally taken up, inasmuch as their vapor pressure is mugh higher than those of the other fractions. If the well is under reduced pressure, products with higher boiling points will also be removed in the gas. The vapors are carried with the gases mentioned in the same manner that water vapor exists in air."

And as further illustrating the methods of extracting casing-head gas or gasoline, we also quote from the case of Wemple v. Producers' Oil Co., 145 La. 1047, 83 So. 237.

"As will be gathered from the statement of the case, the difference between a well which produces oil without casing-head gas (if there is such a well), and one which produces both oil and gas is that in the one case the oil is brought up through a single tube as a whole, with all of its constituent elements together, and in the other the heavier constituents are brought up through a two-inch tube, while the lighter ones, taken up by the gas, ascend through the pipes in which the tube is inclosed. It is true that the lighter constituents do not come up in the form of oil, but both litigants assert that the liquid into which they are converted (or convert themselves merely by reason of their subjection to a lower temperature) is produced and saved, on the premises, from the lighter constituents of the same oil which it is the purpose of the contract to produce and save, and the heavier and remaining elements of which are brought up in liquid form, from the same well, at the same time, and through a tube inclosed in the identical pipes which bring up the vaporized lighter elements. So far as we can see, there is nothing to prevent the owner from selling to one person the right to take such oil as he can bring to the surface in liquid form, and to another that portion of the same oil that can be brought up only in a state of vapor."

[2] Our conclusion is that the casing-head gas or gasoline must be considered as part of the oil since it partakes of the nature of that substance rather than what is ordinarily known as natural gas. It makes no difference that it is brought up in the form of vapor, or is extracted by artificial means. It forms the most important element of petroleum oil, and, as such, the lessee should be required to pay therefor; otherwise, he would be receiving a very valuable product without giving anything in return therefore. On this basis, plaintiff, we think, should receive a one-eighth royalty. Wemple v. Producers' Oil Co., 145 La. 1031, 83 So. 232; Locke et al. v. Russell et al., 75 W. Va. 602, 84 S. E. 948.

For the reasons assigned the judgment appealed from is reversed, the motion to dismiss is overruled, and the case is remanded for further proceedings not inconsistent herewith.

