### STINE et al. v. LONE STAR GAS CO.
### (No. 11826.)

Court of Civil Appeals of Texas. Fort Worth.
Nov. 9, 1929.

Rehearing Denied Jan. 4, 1930.

C. C. McDonald and Kay, Akin & Smedley, all of Wichita Falls, for appellants.

Taylor, Muse & Taylor, of Wichita Falls, and Karl Griffith and Roy C. Coffee, both of Dallas, for appellee.

CONNER, C. J. In the years 1911 and 1912, J. H. Stine and others of the same family and with like interest were owners of lands situated in Clay county, Tex., aggregating more than 750 acres. On November 23 and December 5, 1911, the Stines, as we shall hereinafter refer to them, and designated as parties of the first part, for a cash consideration aggregating $24,738, executed deeds to the Lone Star Gas Company, designated as party of the second part, conveying "all our right, title and interest, ownership and claim, both present and prospective in all natural gas in and to the following tracts and parcels of land lying and being situated in Clay County, Texas." (Here follows a description of the lands referred to.) The conveyances mentioned were duly acknowledged and recorded.

Coincident with the execution of the deeds, what is styled an "operating agreement" was entered into between the parties. We shall copy such parts as we think essential to an understanding of the vital question presented in the case, omitting other parts not deemed to be material. The contract recites that:

"It is understood that in seeking oil the first party may find gas, and that in drilling for gas, the second party may find oil, and that in a well brought in by either party there may be both oil and gas, and it being intended that each party shall so far as practicable and possible, operate all wells producing their respective products only and that both parties shall have joint operation of wells yielding both products so as to save all of such products, it is therefore agreed:

"First: That either party may drill, except as hereinafter provided, as many wells upon any part of said land as such party may choose, and to any depth such party may desire to fully test the land for the parties' own product for oil or gas. * * *

"Second: It is agreed that either party drilling a well shall make and keep an accurate log of the drilling and a full and correctly itemized account of all the expenses of drilling, including cost of derrick and other equipments, piping, casing, etc. * * *

"Fourth: The first party shall have the right to purchase any well drilled by the second party on said land that when finished is, or shall afterwards become, productive of oil only; and the second party shall have the right to purchase any well drilled by the first party on said land that at the time when finished is, or afterwards shall become, productive of gas only. * * *

"Fifth: If any well drilled on said land by either party shall at completion be, or thereafter become, productive of both oil and gas that may be saved and utilized in paying quantities, each party except as hereinafter provided shall be entitled to the product owned by that party and to have the same saved, and in such case there may be cooperation in the saving of such products. * * *

"Seventh: If the well be productive of both oil and gas the party that drilled the same shall give the other party the same notice, furnish the statements and offer the opportunity for investigation and testing, as above mentioned, and such other parties shall have the same right to accept and pay on the offer for participation as in an offer for sale. * * * If the well has been brought in by the second party and it desires to operate for the gas but the first party does not desire to operate for the oil, and the second party elects to save the oil, it may do so and have and

own the same except that one eighth of the value thereof in the pipe line shall be rendered and paid to the first party. * * *

"Twelfth: Each party shall by packing or shutting in, or other proper and adequate means, and by the best methods and appliances in practical use in the oil and gas business, diligently confine and save the oil and gas produced in any well brought in by, or under the control of such party, and prevent waste thereof."

The evidence shows that appellee has drilled a number of wells on appellants' land from the time the deeds and contracts were made to the present time, and now has about eight wells on the land. Prior to 1916 the gas from the wells on appellants' land was conveyed from the wells to a compressor station owned by the appellee at Petrolia, about a mile and a quarter or a mile and a half from the wells. This compressor station was for the purpose of increasing the pressure of the gas so that it could be transported through the pipe lines. From this station the gas was run into the pipe line of the appellee, whch conveyed the gas to Fort Worth, where it was sold for fuel purposes. Prior to 1916, and during the winter months, and from no other cause than the lower temperature of the winter and the pressure in the pipe line, gasoline accumulated in the drips along the pipe line, and this gasoline was taken from the drips in large quantities by many persons and used for running their automobiles without any refining process.

In the year 1916 the appellee built its absorption plant, and after the completion of that plant the gas from the appellants' land was conveyed from the wells to the compressor station, and from the compressor station to the absorption plant, where it was run through a certain kind of crude oil. This crude oil absorbed from the gas the gasoline which was carried along with the gas in the form of vapor, and the dry gas, after the gasoline had thus been absorbed from it, went into the main lines of appellee, and was transported to various cities for fuel purposes. One of appellee's witnesses described the process of extracting the gasoline as being a method by which gas was run through a certain kind of oil so that the oil became saturated with the hydrocarbons that go to make gasoline. The testimony is that this gasoline vapor may be converted into gasoline either by the absorption method used by the appellee, or by compression and cooling. That is, that by compression and lowering of temperature, the gas or vapor will be changed from its vaporous form into liquid, and this is the method which is ordinarily used in changing casinghead gas into gasoline.

This suit was instituted by appellants against appellee in the district court of Clay county, setting forth the conveyances and operating agreement hereinabove described, which are made exhibits to the petition, and alleged that subsequently thereto the appellee had drilled and operated a number of wells on lands described in the conveyances and that said wells, in addition to producing dry or natural gas, produced oil which flows from said wells in the form of a vapor heavily saturated with oil and gasoline, or in the form of what is commonly known as wet gas, or casinghead gas heavily saturated with oil and gasoline, and which vapor or wet gas or casinghead gas is readily condensed into oil and gasoline. Plaintiffs prayed for an accounting and for the recovery of a one-eighth royalty of all oil or gasoline that had been produced by the appellee gas company.

The appellee company pleaded a general demurrer, special exceptions, special denial, and the two and four years statute of limitation, and specially that:

"The terms 'natural gas' and 'oil' as used in the deeds, conveyances, and operating agreements described and referred to in plaintiff's petition, were meant and intended in their usual and ordinary sense and are to be construed as the masses of mankind understand said terms; and that the term 'natural gas' has reference to and means the gaseous substance or vapor which flows from the mouth of a well producing gas and covers all gas of whatsoever kind or character in and under the realty described in plaintiff's petition, and that the term 'oil' has reference to the mineral oil which flows from the mouth of a well which produces oil, or is pumped therefrom and which is otherwise known as crude oil or petroleum."

Appellee further alleged:

"That a conveyance of 'natural gas' in and under the realty described in plaintiff's petition embraced each and every part, element, and constituent of the gas or vapor which could be produced from said realty; including all carbons, hydrogens, methane, ethane, propane, butane, penatne, hexane, nitrogen, helium, and each and every other part and constituent thereof to the same extent that the plaintiffs were the owners of the 'oil' and each and every part, element, and constituent of the oil, including gasoline, benzine, kerosene, naphtha, lubricants, paraffin, and carbon cake, and any and all other products which may be derived from oil by any process of manufacture or refining.

"Appellee alleged that any gasoline recovered from the natural gas produced from the premises described in plaintiff's petition, was and could be recovered solely through a manufacturing or refining process; and appellee specially denied that it produced or recovered casinghead gasoline, oil, or gasoline as such, from the said premises, or that it is obligated for any accounting whatever to the appellants herein.

"Whereby appellee prayed that appellants take nothing by their suit and that it have recovery of its costs."

A jury was duly impaneled, but after the close of all the evidence offered by the parties the court peremptorily instructed the jury to return its verdict for the defendant company. Upon a verdict so returned judgment was entered that the plaintiffs take nothing by their suit, from which judgment the plaintiffs have duly prosecuted this appeal.

It is undisputed that the appellee company has produced from the gas from wells drilled and operated by it during the period not covered by appellee's plea of limitation, to wit, from October 21, 1921, to August 31, 1926, gasoline to the value of $35,819.50. Appellee in its brief says, and with this we concur, that:

"Neither appellants nor appellee contend that the terms 'natural gas' and 'oil,' or other terms and expressions as used in the deeds and operating agreements, are ambiguous, indefinite, or uncertain, and that such instruments should be reformed so as to be definite and certain as to the intention of the parties. They rely on the instruments just as they are written.

"Appellants, in their petition, and in their brief, wholly confine their right of recovery on the theory that appellee took natural gas, which was wet gas, containing gasoline vapor, similar to and the same as casinghead gas from the wells, and condensed, extracted, or manufactured gasoline therefrom, which was oil under the terms of the deeds and operating agreements. Consequently there is and can be only one issue before this court, to wit:

"Is the gasoline manufactured by appellee from natural gas, oil produced and saved from oil and gas wells under the terms of the deeds and operating agreements between the parties?

"When that question is answered in the affirmative or negative by this court, this case is decided. If it is oil, appellee owes the royalty without further contention. If it is not oil, appellee owes no royalty, regardless of other questions involved. If the issue as to the interpretation of the deeds and contracts is a matter of law for the court and not for the jury, as we believe, then the judgment of the lower court should be affirmed.

"If the issue, concerning the interpretation of the deeds and contracts as to whether gasoline manufactured by appellee from natural gas is oil produced from oil and gas wells under the terms of the deeds and contracts, is one of fact for the jury, then, we submit there was no conflicting evidence upon which such issue could have been submitted to the jury and the judgment of the lower court should be affirmed.

"On the contrary, if this court should find that as a matter of law the court below should have taken judicial notice that gasoline is oil under the terms of the deeds and operating agreements between the parties, then the judgment should be reversed and rendered in favor of appellants."

This case was tried and principally briefed during the period when the question of whether casinghead gasoline or wet gas was oil, within the meaning of the ordinary lease entitling the lessor to the reserve royalty, was unsettled. Since the trial, however, the question seems now definitely settled by our Supreme Court, so that as it appears to us the determination of the vital issue in this case is simple. The latest judicial pronouncement relating to the subject is to be found in the opinion of Reynolds v. McMan Oil & Gas Co. (Tex. Com. App.) 11 S.W.(2d) 778, opinion by Judge Ocie Speer. Among other things, he announces the familiar rules of construction that in construing a deed or legal contract the intention of the parties is of primary and controlling importance, and that where the contract is unambiguous, the intention of the parties must be determined from the language of the instrument itself, considering all its parts in their proper bearing, and, if the terms of the instrument give it a definite legal effect, the inquiry is concluded, as a matter of law. That case presented the question of whether a lessor under the mineral lease in common use in this state may recover from the lessee for gasoline manufactured from casinghead gas under the stipulation for the usual royalty on oil produced and saved. It was held in an exhaustive opinion that the lessor was so entitled to recover, citing 1 Thornton on Oil & Gas (4th Ed.) § 137b; Gilbreath v. States Oil Corp. (C. C. A.) 4 F. (2d) 233, writ refused 268 U. S. 705, 45 S. Ct. 639, 69 L. Ed. 1167; Livingston Oil Corp. v. Waggoner, 273 S. W. 903, by the Court of Civil Appeals from the Seventh District. To which cases we will add: Stephenson v. Calliham (Tex. Civ. App.) 289 S. W. 158; Locke v. Russell, 75 W. Va. 602, 84 S. E. 948; Twin Hills Gasoline Co. v. Bradford Oil Corp. (D. C.) 264 F. 440; Wemple v. Producers' Oil Co., 145 La. 1031, 83 So. 232.

It was admitted below that the Stines were the owners of the lands described in the plaintiffs' petition, and of all the oil and gas in and under the same, and it is clear from the deed from which we copied in the beginning of this opinion that no oil, but gas only, was acquired by the appellee company by virtue of the conveyances and the operative agreement, executed at the same time, is in harmony with this construction of the conveyances. The operative agreement contemplated that either party might drill for oil or gas, and in the fifth paragraph of the operative agreement we find these significant words:

"If any well drilled on said land by either party shall at completion be, or thereafter become, productive of both oil and gas that *may be saved and utilized in paying quantities,* each party except as hereinafter provided shall be entitled to the product owned by that party and to have the same saved." (Italics ours.)

There was no later exception in conflict with the effect of the words quoted.

In the seventh paragraph of the operative agreement it was provided that:

"If the well has been brought in by the second party and it desires to operate for the gas but the first party does not desire to operate for the oil, and the second party elects to save the oil, *it may do so and have and own the same except that the one eighth of the value thereof in the pipe line shall be rendered and paid to the first party."* (Italics ours.)

Under such contract and terms of agreement, and under the authorities hereinabove cited, it seems very plain to us that regardless of the method of production, appellants, as a matter of law, are entitled to the one-eighth royalty specified in the agreement.

Appellee presents no claim for compensation for the recovery of any part of the cost of producing from the wet gas the gasoline in question, and we therefore need not consider whether in any event appellants should be charged under any equitable rule with a proportionate part of such cost.

We accordingly conclude that the judgment below should be reversed and here rendered in appellants' favor for all costs of suit and for one-eighth of the agreed value of the gasoline involved, to wit, one-eighth of $35,-819.50, together with interest thereon at the legal rate from the date of the institution of the suit, on October 25, 1925.