440

C. P. Bullis, of Ferriday, La., for plaintiff.

Sholars & Gunby, of Monroe, La., for defendant.

DAWKINS, District Judge.

At the pre-trial hearing, report of which was filed July 21, 1944, there was reserved, for later ruling, the question of the meaning of the third and last clause of the provision for royalties under the lease. Briefs were to be filed within ten days. On July 27 defendant filed its brief, but so far, there is no brief for plaintiff in the record.

The three royalty provisions are quoted in full as follows:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth of all oil produced and saved from said leased premises.

"2nd. To pay the lessor 1/8 part of net proceeds at prevailing market price at well for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense.

"3rd. To pay lessor for gas produced from any well used off the premises for the manufacture of casing head gas, 1/8 part of net proceeds at prevailing market price at well, for the time during which such gas shall be used."

It was conceded that an interpretation of this last clause involved a question of law only, and should be decided in advance of the trial, so that, if it were held plaintiff is not entitled to anything for the gasoline extracted but only for the gas used for that purpose "at market price at the well," then the necessity for taking testimony upon this point would be eliminated.

This court has had occasion to construe a similar clause in another case in which counsel on both sides were the same, Mc-Coy et al. v. United Gas Public Service Co., 57 F.Supp. 444. It is felt that no useful purpose can be served by again reviewing the authorities, which, it is believed, are controlling, and I quote the pertinent portions thereof as follows:

"Plaintiffs allege that they are the lessors in an act dated Dec. 6, 1926, of some 490 acres of land in the Richland Parish gas field, upon which the defendants, as lessees, have drilled five wells producing large quantities of wet natural gas and from which they have extracted and sold thousands of dollars worth of gasoline, but have refused to pay plaintiffs their one-eighth royalty thereon. The lease is annexed to the petition and the prayer is for an accounting and judgment for whatever sum may be found to be due.

"Defendants have moved to dismiss the petition on the ground that it discloses no cause of action.

"The contract recites that for a price of $5,600 cash, and other valuable considerations, the lessor leased the property for a period of five years, and as long thereafter as oil and gas, or either, is produced, and the lessee agreed:

" '1st. To deliver to the credit of the lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from said leased premises.'

" '2nd. To pay lessor $200.00 each year for each well producing gas only, until such time as the gas shall be utilized or sold off the premises, and at that time the royalty above named shall cease and thereafter the grantor shall be paid one-eighth (1/8) of the value of such gas, calculated at the rate of market price cents per thousand cubic feet, corrected to two pounds above atmospheric pressure, the lessor to have gas free of cost from any well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connection with the wells at his own risk and expense.'

" '3rd. To pay lessor for gas produced from any oil well and used off the premises or for making of casing-head gasoline one-eighth (1/8) for the time during which such gas shall be used, said payments to be made three months in advance.'

"The petition alleges that plaintiffs are entitled to an accounting for one-eighth of the said gasoline under the first clause of said lease just quoted, and in the alternative, successively, under the second

442

and third clauses, and finally also in the alternative, if the gasoline is not covered by any one of said clauses, then defendants 'had no right to produce and save the same from said premises and owe plaintiffs an accounting of all of such gasoline or oil saved and produced therefrom.'

"It will be noted that while the first clause requires the lessee to 'deliver to the credit of the lessor, free of cost, in a pipe line * * * the equal one-eighth part of the oil * * *' the second clause obligated him to 'pay to the lessor $200.00 each year for each well producing gas only,' until the gas is sold or utilized off the premises and then 'he shall be paid one-eighth (1/8) of the value of such gas'; and in the third, he promises to pay the lessor 'for gas from an oil well * * * or for the manufacture of casing-head gasoline, one-eighth (1/8) for the time during which said gas shall be used.' In other words, the oil, when produced, is to be the joint property of the lessor and the lessee in the proportion of one-eighth to the former and seven-eighths to the latter, but gas, whether from a well producing that mineral alone, or from an oil well, is to belong to the lessee, with the obligation to pay the lessor one-eighth of the value thereof.

"The three clauses, it would seem, purport to provide a method for ascertaining and paying for both oil and gas in whatever manner produced. Now, it is my opinion that they are to be construed according to the meaning of the terms and language used therein as commonly understood by this particular industry. R.C.C. 1945, 1946 et seq. Ordinarily, 'oil' as used in a contract of this kind means crude or unrefined petroleum, which is measured and sold by the barrel according to grade or gravity; and gas consists of invisible vapors which are produced from the earth, containing varying amounts of hydrocarbon, some of it denominated 'dry' and in other instances, 'wet,' depending upon the amount of gasoline which can be extracted therefrom. I take it that no one would seriously contend that in the case of a well producing oil alone, it should be paid for under this or similar contracts or any other basis than so much per barrel, the price depending upon the gravity, quality and market at the time of the sale. And in ordinary circumstances, where the gas is used for fuel in domestic or industrial consumption, the recognized method and measure for payment is so much per thousand cubic feet. In most, if not all, contracts,

covering oil, the provision for payment is on the basis of a fraction of the value, because, no doubt, of the well known fluctuation of the price; whereas, as a rule, the price stipulated for natural gas is so many cents per thousand cubic feet,—in fact in this particular lease, the printed form uses the words, 'at the rate of ——— cents per thousand cubic feet,' with the inept expression 'market price' typed in.

"In the cases of Wemple v. Producers Oil Co., 145 La. 1031, 83 So. 232, and Gilbreath v. States Oil Corporation, 5 Cir., 4 F.2d 232, in both of which the writer participated, the court was dealing with casing-head gas, which was produced from an oil well. Therefore, whether treated as oil or as a substance not within the contemplation of the parties and for which no provision was made, the essential fact remained that the gasoline was taken from the oil of which it formed a part by the simple and mechanical method of condensation. In the present contract, however, express provision is made for the payment for gas of this nature and of course the parties had the right to stipulate therefor as they saw fit. Hence there is no occasion to construe any clause of the contract dealing with the conditions which obtained in those cases, both for the reason just stated and for the further reason that no oil is produced from the wells in the present case, unless, as contended by the plaintiffs, it can be said that the gasoline extracted from the natural gas is oil within the meaning of the first clause above quoted. The case of Coyle v. Louisiana Gas & Fuel Company, 175 La. 990, 144 So. 737, decided by the Supreme Court of Louisiana last spring, and in which I understand a rehearing was granted, and is still pending, was one wherein the lessee conceded that the lessor was entitled to a portion of the value of the gasoline extracted from the gas and the controversy was as to whether it should be one-eighth of the full value after extraction, or one-eighth of what was received by the lessee after paying for the cost of such extraction. Besides, it was conceded by all concerned, that the gas as it came from the well was so heavily laden with gasoline as to be unfit for any purpose, until the gasoline was taken out, and could not be used for the benefit of either party in its natural state. No such condition exists in the present case, but on the other hand, I think we are bound to assume, since there is no allegation in the petition to the contrary, that the plaintiffs have

been paid for the gas on the basis of market price.

"The court went a long way in both the Wemple and Gilbreath cases to protect the lessor against the consequences of what was, at the time of those leases, a comparatively new discovery in the petroleum industry, and which otherwise would have inured solely to the benefit of the lessee under contracts already made when the fact became generally known. It was also reasonably clear that the gas which was condensed passed through the oil, carrying with it particles of the most valuable element, the amount of which was probably augmented by the method used. However, the present lease was made in 1926, when, in most of the fields of the country where gas was produced containing gasoline of a commercial value, the latter was being extracted, and in Louisiana was required by the Conservation Department of the state. In fact, many of the contracts today expressly provide for the lessor's participation in the profits arising from the extraction of the gasoline from natural gas. It can scarcely be said, therefore, that the plaintiffs did not know or could not have had in contemplation at the time of the lease conditions which were fairly well known to the public generally. If they saw fit to make a contract for the sale of the production of a 'well producing gas only' and 'to be paid one-eighth (1/8) of the value of such gas, calculated at the rate of market price per thousand cubic feet', there is no reason in law or morals why they could not do so. If it were sold by the lessee without such extraction, undoubtedly the lessor could claim no more than one-eighth of the price received. And to say that the price should be determined according to the one course or the other pursued by the lessee, would make it depend, not upon the value of the gas as fixed by the contract, but the purpose to which it was put by the lessee. It would be just as reasonable to contend, that, if through some scientific discovery, it should be found that natural gas could be used for some purpose increasing its value to the lessee several fold, he should be required to pay the lessor a proportionate increase in price for the gas, notwithstanding a fixed rate of so many cents per thousand cubic feet, as to hold that because gasoline has been extracted it should pay to the lessor a portion of the value thereof. Of course it is probable that if such discovery were made, the defendant would be able to sell the gas for a much

greater price, in which event it would have to pay the lessee a proportionately higher rate under the provision for 'market price.'

"Under the law of Louisiana, unlike that of Texas, a lease does not vest in the lessee title to the minerals, but only an exclusive right to produce the same ownership being completed by reducing them to possession. Nevertheless, the decisions of the latter state are persuasive, especially when they appear to be in harmony with the rules of construction as laid down by the Louisiana Civil Code and the jurisprudence of the state. There appears to be no uncertainty or ambiguity in the contract now under consideration and in similar cases the courts of Texas and Oklahoma have held that such contracts should be construed according to their usual and ordinary meaning. Gulf Production Co. v. Taylor, Tex.Civ.App., 28 S.W.2d 914; Magnolia Petroleum Co. v. Connellee, Tex. Com.App., 11 S.W.2d 158; Mussellem v. Magnolia Petroleum Co., 107 Okl. 183, 231 P. 526.

"I am constrained to hold, therefore, that since the petition makes no claim for the payment for gas which has been produced but merely for the plaintiff's alleged interest in the gasoline extracted therefrom, it discloses no cause or right of action and the motion to dismiss should be sustained. Proper decree should be presented."

The only difference between the provision as to gasoline in the earlier case and the present one, is that the former also included "gas produced from any oil well," and eliminating that clause, the same reads as follows:

"To pay lessor for gas * * * used off the premises or for making of casing-head gasoline one-eighth (1/8) for the time during which such gas shall be used, said payments to be made three months in advance."

Whereas in the instant case the clause provides:

"To pay lessor for gas * * * from any well and used off the premises for the manufacture of casing-head gasoline, one-eighth (1/8) part of net proceeds at prevailing market prices at well for time during which such gas shall be used."

In both instances the "market price" was to be paid, but in the present case it was specifically stated as being "at the well." This would seem to indicate even more clearly that it was one-eighth

of "net proceeds" for gas only, for the reason that it would be next to impossible to ascertain the net proceeds of gasoline extracted at a distant point unless some value were placed upon the gas at the well from which it was extracted. If, as a matter of fact, a net loss was sustained in manufacturing the gasoline, the lessor would receive nothing for his gas so used if plaintiff's interpretation were applied.

The only alternative would be to arbitrarily say that he should receive the market price of the gas as stipulated in the second royalty clause of the lease, and in addition the net proceeds of the manufactured gasoline. It should be noted that in the third clause in the present case the obligation of the lessee is to "pay for gas produced * * * for the manufacture of casing-head gas" (which was undoubtedly intended to embrace gasoline) and not to pay for gasoline.

If my ruling in the former case was correct, and I still believe it was, it inevitably follows that plaintiff is not entitled to recover for the gasoline extracted from the natural gas in the present instance.