411 So.2d 634 (1982)
SHELL OIL COMPANY and Pennzoil Producing Company
v.
WILLIAMS, INC., et al.
No. 12655.
Court of Appeal of Louisiana, Fourth Circuit.
March 9, 1982.
*635 C. Murphy Moss, Jr. and Loretto M. Babst, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for plaintiffs-appellees.
Campbell C. Hutchinson and Anthony M. DiLeo, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendants-appellants.
Before SCHOTT, AUGUSTINE and KLEES, JJ.
SCHOTT, Judge.
Plaintiffs, Shell Oil Company and Pennzoil Producing Company,[1] as mineral lessees, brought this action for declaratory judgment against their lessors. Defendants are Williams, Inc., a corporation, and various individual members of the Williams family. They reconvened for a cancellation of the leases and an accounting by plaintiffs for an alleged deficiency in royalty payments. The issue is over the application of the royalty payments clauses in two leases executed in 1934 and 1952, in circumstances where the leases provide for the payments to be based on the market value or price of the gas produced from wells and where the gas has been committed irrevocably to an interstate pipeline. More specifically, the question is whether the royalty payments are controlled by the federally regulated price for which the lessees have sold the gas or whether the royalty payments should be based on the value of the gas sold in the unregulated intrastate market. From a judgment in favor of plaintiffs defendants have appealed.
In 1934 Shell took a mineral lease from defendants on lands in Terrebonne Parish, Louisiana, known as the Gibson Field. In 1939 a producing gas well was drilled but shut in due to the absence of a pipeline which would make the gas marketable. In 1941 Shell reached an agreement with Pennzoil's predecessor, Union, and United Gas Pipeline Company, under which Shell's mineral lease would be subleased by it to Union, Union would drill two gas wells on the leased property, United would connect the wells to its interstate pipeline, and the gas would be sold by Union to United. As required by the lease between Shell and defendants, the latter's consent was necessary in order for Shell to sublease to Union *636 and such consent was given by defendants. As discussed hereafter, an important issue in the case is the significance or effect of defendants having consented to the sublease at this time. In 1944 Shell and another gas producer entered into an agreement with United to sell all of the gas produced on the lands in the Gibson Field.
A tract of 20 acres had been released from the original 1934 lease. In 1952 Williams, Inc. leased this 20 acres to various individual members of the Williams family who subsequently assigned the lease to Shell. In 1955 the original Williams-Williams lease was amended by agreement with Shell so that the royalty fraction in the original lease was increased from 1/6 to ¼. In the meantime, on June 7, 1954, the Supreme Court of the United States decided the case of Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954) and there held that the Federal Power Commission had the power to regulate the price charged at the well by gas producers to interstate pipeline companies. Thus, when the amendment of the Williams-Williams lease was made in January, 1955, the parties were charged with the knowledge of the Phillips case, and an important issue emerges as to defendants assuming responsibility for the drastic consequences which would follow from the Phillips decision.
As a result of the Phillips decision the F.P.C. required gas producers like Shell and Pennzoil to obtain certificates of convenience and necessity. Once issued, a certificate could never be revoked as a practical matter until the well ran dry, so that defendants' gas was, in effect, irrevocably committed to the interstate pipeline of United. Furthermore, the price which Shell and Pennzoil would receive from United was no longer negotiable but would be regulated by the F.P.C. with a resulting price ceiling. In 1959 Shell and Pennzoil entered into a 20-year contract for the sale of gas from the Gibson field to United for graduated-prices over the years, subject to federal requirements.
When price control of natural gas at the well began in 1954 with the Phillips decision, the supply of gas far exceeded its demand so that price control had little impact on the market price at the beginning. This situation continued over 16 or 17 years but by 1971 the demand for natural gas exceeded the supply and buyers were willing to pay prices which exceeded the federally imposed ceilings. In ensuing years an attractive market developed for gas producers, but this market was confined to consumers within the State of Louisiana, i.e., sales to intrastate pipelines as opposed to gas sales committed in interstate pipelines under the jurisdiction of the F.P.C. By the time this case was tried in 1980 there was a vast discrepancy between the regulated price of gas Shell and Pennzoil were getting from United as compared to the price of gas in the intrastate market.[2] Plaintiffs' position is that defendants' royalty payments are to be based on the highest price payable under the federal regulations while defendants maintain their royalties should be based on prices prevailing in the intrastate market.
The case was tried to a commissioner of the Civil District Court and his report was accepted by the trial judge. In his report, the commissioner considered the effect of Mobil Oil Corp. v. Federal Power Commission, 463 F.2d 256 (D.C.Cir.1971) cert. denied 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972), in which the court held that the jurisdiction of the F.P.C. does not extend to the lessor-landowner, but the Commissioner continued:
"In the exercise of jurisdiction the F.P.C. required the dedication to the interstate system, which dedication was effectively coextensive with the life of the lease itself. The production of gas itself serves to extend the life of the lease. The lease intent is clearly to vest in the producer all *637 rights to all production until depletion of the resource. The federal regulatory scheme tracks this intent by imposition of field dedication to the interstate system. The fact that the regulatory effect cannot be legally applied to the lessor role in the production of gas does not, standing alone, free the contractual terms from the indirect effect of validly applied regulation.
* * * * * *
All gas encompassed within the terms of the leases is dedicated to the federal system as fully as if the landowner was also the producer. The lessor-landowner apparently surrendered this right of dedication to the producer via the lease contract or the law, and it was exercised by the producer. The Court cannot be blinded to the fact that the landowner's gas, upon which the royalty must be based, is now dedicated to the interstate market and cannot be sold otherwise. It is therefore in this market that the measurement of `value' must be made. The Williams' interests concede that no monetary deficits existed when this market was effectively the corner of the gas market from the inception of production in 1941 until 1972."
This approach ignores the basic relationship between the parties to a mineral lease. LSA-R.S. 31:114 defines a mineral lease as a contract by which the lessee is granted the right to explore for and produce minerals.[3] Lessor has the simple obligation of maintaining the lessee in possession of the premises, §§ 119 and 120. The lessee is not under a fiduciary obligation to lessor but is bound to perform in good faith and to develop the property as a reasonably prudent operator for the mutual benefit of the parties, § 122. The royalties paid to the lessor upon production under the lease are rent for the leased premises, § 123. There was no deviation from these general principles in the leases under consideration in this case. Shell and Pennzoil had the right to extract the gas from defendants' land. They could dispose of it as they saw fit and the consideration they bargained for in obtaining these rights was the rent payable to defendants as set forth in the royalty clauses. In the 1934 lease the rent or royalty was fixed at 1/8 "of the value" of the gas "calculated at the market rate prevailing at the well," and in the 1952 lease the rent or royalty was 1/6 [subsequently amended to ¼] "of the value" of the gas "calculated at the market price prevailing at the well."
Until the federal government injected itself into the production of natural gas there was a clear understanding of the phrases "market value" or "Market price" for the purpose of computing the amount of royalty due a lessor. Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561 (1934). In this case the lessee sold the gas at a point some miles away from the well for 5.3 cents per thousand cubic feet (Mcf), but the court held that the lessor-landowner was entitled to royalty payments based on the price of 4 cents per Mcf since that was the price at the well with the additional price obtained by the lessee being increased because of its expense in transporting the gas from the well to a market beyond the gas field. Shell and Pennzoil take the position that the moment the gas comes into their hands at the well its value is inextricably limited by the price for which they can sell the gas under federal regulation. In other words, the value of this gas is forever limited because it was and is irrevocably committed to United's interstate pipeline.
On the other hand, defendants demonstrated that gas in an adjacent field was sold to an intrastate pipeline and, indeed, in one unit some gas is being sold to the interstate pipeline while other gas is piped intrastate by Shell to its Norco, Louisiana, refinery for its own consumption. While Shell pays the landowner in that unit some *638 royalty based on the regulated interstate price for gas put into the interstate pipeline it pays a substantially higher royalty to that landowner for the gas it consumes at its plant. Defendants contend that market value at the well must take into consideration the potential intrastate price which the gas could command before it enters the interstate pipeline.
The commissioner reasoned that it was the lessor's intent "to vest in the producer all rights to all production" and that the lessors "surrendered" to the producers the right to dedicate the gas to the interstate market. From this finding of intent on the part of the lessors the conclusion readily followed that the lessors were limited to royalty based on the regulated price of gas. Shell and Pennzoil are quick to take up the cudgel in defense of this position and attempt to show that the evidence established some such intent on the part of defendants. Such facts are as follows:
In 1941 when the Gibson area agreement, consisting of the sublease by Shell to Union with the attendant farmout and the sale of the gas to United, was struck, it was necessary for Shell to obtain defendants' consent to make the sublease. All of the proposed documents were made available to defendants and the documents reviewed by their lawyers and geologists before they gave their consent to Shell to make the sublease. In 1952, when the second lease was confected, the sale to United of the Gibson field gas was an accomplished fact. In 1955 defendants were called upon to consent to a sublease by the Williams' individuals to Shell they not only had knowledge of the interstate destination of the gas but they were also charged with the knowledge that federal regulation of such gas production had been approved by the Supreme Court in the Phillips case. From these facts, Shell and Pennzoil argue that defendants agreed to commit the gas to the interstate pipeline, to accept federal regulation, and to be paid royalty based on the regulated price of the gas. We are simply unable to reach this conclusion from the record.
At the outset it must be understood that no one, not Shell, Pennzoil, United or defendants could visualize the drastic effects of their actions taken in 1941, 1952, or even 1955. Undoubtedly with the advent of the Phillips decision knowledgable parties could predict serious consequences flowing from federal price control of gas. On the other hand, no one could in 1954 predict the radical change in the gas market which took place over the ensuing 16 years. The events which caused the gas market to change from an over abundant supply to a near shortage were beyond anyone's control or foreseeability. Thus, any evaluation of the actions taken by these parties in these early years must be made without regard to developments which have occurred since that date.
When the 1941 transaction is considered in the proper light, the only participation by defendants was to supply their consent for their lessee, Shell, to sublease to Union. Anything else which took place was concocted and engineered by Shell in participation with Union and United. Once the latter parties had the consent to sublease they took it upon themselves, to the exclusion of defendants, to commit the gas to the interstate pipeline. The same applies to the 1955 sublease. Defendants were asked only one question: "Do you consent to a sublease by the Williams individuals to Shell?" When given an affirmative reply Shell was in full charge of marketing the gas. Had it not taken this sublease the Williams individuals would have been left with other choices and could have diverted the gas under their 20 acres into the intrastate market.
Thus, we have concluded that the commissioner, and the trial court, erred in concluding that defendants formed any intention to commit their gas into the interstate pipeline or to change the terms of the lease with respect to computation of the royalty payments in any way. Furthermore, the trial court erred in failing to consider prices paid for gas in intrastate sales in order to determine the market value of the gas for computation of royalty payments due defendants.
*639 In reaching these conclusions we have considered the case of Henry v. Ballard & Cordell Corp., 401 So.2d 600 (La.App. 3rd Cir. 1981). In that case the court considered a similar case involving four leases confected in 1953, 1960, 1962 and 1964, where the gas was sold by the defendant-producer-lessee to an interstate pipeline in 1961. The court framed the problem as follows:
"The contract term `market value' as used in the royalty provision of the various leases is susceptible to two interpretations: The plaintiffs-lessors contend the term necessarily means that their royalties must be based upon an ever-changing market value of natural gas which is to be determined on a daily basis as gas is produced and/or delivered to the gas purchaser; the defendants-lessees contend that the parties meant for lessors' royalties to be based upon the prevailing market value at the time the gas reserves were committed to the purchaser under the 1961 contract."
The court resolved the problem as follows:
"We find that the parties intended for the lessors' royalties to be based upon the prevailing market value for natural gas at the time these natural gas reserves were committed to American Louisiana in 1961. This interpretation espoused by the defendants-lessees is supported by the evidence and is the only one under which the common intent of all the parties can be realized. The plaintiffs-lessors' interpretation is not supported by the evidence, and its adoption would lead to results never intended by the parties, as we will explain later."
We are unable to determine from that opinion what facts, if any, convinced the court as to the intention of the lessors to base their royalties on the regulated interstate prices, but if those lessors, as here, did nothing more than consent to subleases we disagree with the court's conclusions. We adhere to the view that the market value of the gas is its value at the moment it leaves the well and before the producer places it into the interstate pipeline and under the umbrella of federal regulation.[4]
Having resolved to reverse the trial court on the main demand we turn to defendants' reconventional demand. Defendants originally sought a cancellation of their lease and an accounting for the amount of underpaid royalty, but in their brief in this court defendants ask for a remand to the trial court for the determination of the proper amount of royalties due them. It seems clear that the remedy of cancellation is unavailable to defendants since the power of the federal government precludes interference with gas production under the leases. The testimony with respect to comparable intrastate sales was insufficient to enable this court to determine the market value of the gas extracted from defendants' land during the years in question. Defendants' experts left a number of unanswered questions, the answers to which are necessary in order to compute exactly how much defendants are entitled to recover. One used seventeen comparable sales over a ten year period and testified that these were isolated from hundreds of transactions because he considered the seventeen the best comparables. However, he was quite vague in explaining how he reached this conclusion. Defendants' evidence of what Shell itself valued gas which it purchased on the intrastate market was insufficient to demonstrate the value of the gas on a day to day basis. At some point during the ten year period in question the unit for the measurement of gas for pricing purposes was changed from the amount per thousand cubic feet (Mcf.) to the amount per British thermal unit (MMBtu). An accurate conversion from one unit to the other depends upon the Btu content of the gas under *640 consideration. Defendants' expert arbitrarily assumed Btu content of 1000 in making his conversions from Mcf to MMBtu and admitted that this would only be an estimated value. We have concluded that an accurate measurement of defendants' damages would require extensive additional evidence and probably some exercise of discretion on the part of the trial court. We have resolved to remand the case to the trial court for this purpose.
While it appears that Shell and Pennzoil may suffer some hardship as a result of our action, their position must be considered in light of the following: First, the record indicates that Shell and Pennzoil may obtain a remedy from the FERC in the form of a pass through by which they can obtain an increase in the price of the gas ultimately to be paid by the consumers to compensate them for the higher royalty payments they owe to defendants. Second, as a result of our decision Shell and Pennzoil may be required to pay defendants as much as three times what they are now paying or the equivalent of a 3/8th royalty. This does not seem oppressive in the light of defendants' evidence showing that a currently negotiated gas lease typically provides for royalty to the lessor of as much as 30%. Finally, we agree with the following statement of the court in Foster v. Atlantic Refining Company, 329 F.2d 485 (5th Cir. 1964):
"The fact that the ascertainment of future market price may be troublesome or that the royalty provisions are improvident and result in a financial loss to Atlantic `is not a web of the Court's weaving.' Atlantic cannot expect the Court to rewrite the lease to Atlantic's satisfaction."
Likewise we concur with the following from Exxon Corp. v. Middleton, 613 S.W.2d 240 (Tex.1981) at page 245:
"When Exxon negotiated the gas contracts, it took the risk that the revenue therefrom would be sufficient to satisfy its royalty obligations. That subsequent increases in market value have made these obligations financially burdensome is no reason to compel this court to disregard the plain and unambiguous terms of the royalty clause and rewrite it to conform to the meaning that Exxon, as drafter of the language, says was intended...."
Accordingly, the judgment appealed from is reversed and set aside, and there is judgment in favor of defendants and against plaintiffs, Shell Oil Company and Pennzoil Producing Company, dismissing their main demand. There is judgment on the reconventional demand in favor of defendants and against Shell Oil Company and Pennzoil Producing Company, recognizing defendants' right to an accounting for royalty payments based on market value to be arrived at by the use of all comparable sales of gas including those in the intrastate market. The case is remanded to the trial court for this purpose and all costs are taxed against Shell and Pennzoil.
REVERSED AND REMANDED.
NOTES
[1] Shell Oil Company is the successor of various corporate entities which were involved in transactions with defendants. The present plaintiff, Pennzoil is the successor of Union Producing Company. These matters are inconsequential and for the sake of brevity reference may be made in this opinion to present plaintiffs rather than the predecessors who were the actual participants.
[2] In 1978 federal legislation extended regulation even to intrastate sales of gas under the authority of the Federal Energy Regulatory Commission, successor to the F.P.C. It is not clear from the record as to how this affected the discrepancy between prices but for purposes of this opinion this development is not significant.
[3] We do not imply that the Mineral Code adopted in 1974 applies to this dispute. However, since the code is essentially a codification of the state mineral law which developed jurisprudentially by way of analogy to the Louisiana Civil Code (see introduction to the Mineral Code by the Louisiana State Law Institute) we feel comfortable in borrowing from the code some general observations.
[4] We are informed that the Supreme Court granted writs in this case and it was argued on January 27, 1982. Because we are not convinced that the facts of the cited case and the instant case are the same and because we are not persuaded by the cited case in any event, we have resolved to proceed with this opinion while the cited case is pending in the Supreme Court.