428 So.2d 798 (1983)
SHELL OIL COMPANY and Pennzoil Producing Company
v.
WILLIAMS, INC., et al.
No. 82-C-0840.
Supreme Court of Louisiana.
February 23, 1983.
Rehearing Denied April 15, 1983.
*799 C. Murphy Moss, Loretto M. Babst, Lemle, Kelleher, Kohlmeyer & Mathews, New Orleans, for applicant.
Campbell C. Hutchinson, Anthony M. DiLeo, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for respondents.
MARCUS, Justice.
Shell Oil Company, as lessee, and Pennzoil Producing Company, as sublessee, instituted this action for a declaratory judgment against Williams, Inc. and various members of the Williams family (collectively referred to hereinafter as Williams), as lessors, seeking a determination that they had properly discharged their royalty obligations under the terms of two leases and that the leases were still in force and effect. They also sought injunctive relief. A temporary restraining order was granted. Thereafter, based on the verified petition of plaintiffs and agreement of counsel for defendants, the court entered a preliminary injunction. Defendants answered plaintiffs' petition generally denying the allegations thereof and reconvened for cancellation of the leases and an accounting for an alleged deficiency in royalty payments accruing from October 1, 1971.
The controversy centers around the market value of federally regulated gas which was irrevocably dedicated by the lessees to the interstate market. The alleged underpayments are based on the "market value" royalty payment provisions in two leases, one executed in 1934 and the other in 1952. Neither party contends that the provisions are ambiguous. Both agree and the evidence indicates that the terms "market rate" or "market price" refer to current market value.[1]
Williams contends that the meaning of "value" calculated at the "market rate" or "market price" is clearly understood to mean the current price at which natural gas was sold in the open market, that is, the unregulated market, at the time the gas was produced. Thus, the market value should be determined only by comparable sales in the higher unregulated intrastate market. On the other hand, Shell and Pennzoil contend that to determine the market value of the gas, only comparable sales in the interstate market should be considered because the gas has been irrevocably dedicated to that market. Hence, the sole issue presented for our determination is how to arrive at the "current market value" of this federally regulated gas at the time of its sale.
The case was heard before a commissioner and essentially all of the operative facts, other than those with regard to comparable prices obtained by producers in the intrastate market, were stipulated to by the parties.
In 1934, the predecessors in title to Williams, Inc., as lessors, granted Shell, as lessee, an oil and gas and mineral lease covering 61,442 acres of land. Under the terms of the lease and subsequent agreements between the parties, Shell selected about 3,500 acres overlying portions of subsurface structures known as the Gibson and Humphreys Fields.[2] The lease contained the following royalty payment provision:
Lessee agrees as to royalties ... to pay Lessor for gas and/or casing-head gas *800 produced and saved by Lessee and sold or used from the land hereby leased, (a) one-eighth (1/8) of the value thereof, calculated at the market rate prevailing at the well. (Emphasis added.)
In 1939, a gas well in Gibson Field was drilled and completed by Shell but was shut in. Prior to 1941, only oil was produced from the leased property.
In 1941, Shell entered into an agreement with Union Producing Company (now known as Pennzoil) in which Shell agreed to sublease to Union the gas rights to a portion of the 1934 Williams lease in exchange for an overriding royalty. In return, Union was required to drill two gas wells within a specific period of time and lay a pipeline of adequate size to connect all commercial gas wells to a ten inch pipeline to be constructed by United Gas Pipeline Company under a gas sales contract between Union and United Gas. United Gas' pipeline, known as the Lirette-Mississippi pipeline, was an interstate pipeline.
As required by the lease between Shell and Williams, the latter's consent was required in order for Shell to sublease to Union. All the documents pertinent to the sublease were reviewed by Williams, its lawyers and geologists, including the gas sales contract between Union and United Gas, and written consent to the sublease was given.
In 1944, Shell and another producer, not involved in this litigation, entered into a contract with United Gas for the sale of all gas being produced from the lands and leaseholds presently owned and thereafter acquired in Gibson Field by Shell including the remainder of the lands under the 1934 lease with Williams. The contract contained essentially the same terms and conditions as that between Union and United Gas. Pursuant to this contract, the gas which was to be produced and sold was to be carried in United Gas' interstate pipeline.
In 1952, Williams, Inc. leased 20 acres of land in the Gibson Field which had previously been released by Shell to various members of the Williams family. The royalty payment provision applicable to gas sold or used from the land leased provides:
One-sixth (1/6) of the value [of the gas], calculated at the market price prevailing at the well.... (Emphasis added.)
In 1955, this lease was assigned to Shell with the written consent of Williams, Inc. and the stipulated royalty payment was increased from 1/6 to ¼. The first gas production from this acreage occurred in 1955 and was sold to United Gas pursuant to the 1944 gas sales contract between Shell and United Gas.
Prior to this assignment, the United States Supreme Court decided Phillips Petroleum v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). In Phillips, the Court held that gas producing companies engaged in the wellhead sales of natural gas which was transported and resold by the purchasers in interstate commerce were "natural-gas companies" within the intendment of the Natural Gas Act of 1938. Thus, the rates which could be charged by independent producers in the wellhead sales of natural gas became subject to the jurisdiction of and regulation by the Federal Power Commission (FPC). As a result of the Phillips decision and pursuant to Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), natural gas producers were required to obtain a certificate of convenience and necessity from the FPC in connection with interstate sales then being made. In compliance therewith, Shell applied to the FPC in connection with its 1944 gas sales contract with United Gas and a certificate of unlimited duration was issued. Union also applied and was granted a similar certificate of convenience and necessity in connection with its 1941 gas sales contract with United Gas.
In 1949, 1959 and 1979, Shell and Union (now Pennzoil) extended the terms of their gas sales contracts covering much of the Gibson Field area. It is not contested that they acted prudently and at arms length in entering into these contracts and obtained and paid royalties on the highest price allowed by the FPC regulations for the particular category of gas sold to United Gas *801 from the Gibson Field during the period in question.
Expert testimony in the record establishes that as a result of the Phillips decision there came to exist two separate markets for natural gas, the regulated interstate market and the unregulated intrastate market. The disparity in price between these two markets dramatically increased in the early 1970s with the price of intrastate gas being much higher than that of the federally regulated interstate gas.[3] As a result, Williams became dissatisfied with the royalties it was receiving for its gas which had been dedicated to the interstate market. In 1973, Williams, by written letters to Shell and Pennzoil, claimed that the gas royalties it was receiving were below the "market value" and requested that Shell and Pennzoil make the necessary adjustments. Shell and Pennzoil responded and asserted that the royalties were based on the highest prices allowed by the FPC and that they had satisfied their royalty obligations under the terms of the leases. In 1974, Williams reiterated its demand for additional royalties and sought cancellation of the leases for non-compliance with the royalty provisions. This action for a declaratory judgment and injunctive relief was instituted by Shell and Pennzoil.
After a preliminary injunction was granted, the matter was referred to a commissioner by the district judge. After a hearing at which virtually all the facts were agreed to by the parties in a written stipulation of fact, the commissioner found the gas in question had been dedicated to the interstate market and could not be sold otherwise. Thus, it was only in this market that the "measurement of value" could be made. The district judge accepted the findings of the commissioner and rendered judgment in favor of Shell and Pennzoil and against Williams declaring that the royalty payment provisions with respect to gas "included as a limitation" all appropriate ceilings on price imposed by federal regulations which "affect the gas saved and produced within the intent of the leases." The preliminary injunction previously issued was ordered to remain in full force and effect until the judgment became final. The reconventional demand was dismissed.
The court of appeal, finding that the market value of the gas is its value at the moment it leaves the well and before the producer places it into the interstate pipeline and under the umbrella of federal regulation, reversed the judgment of the district court. It also rendered judgment on the reconventional demand in favor of Williams and against Shell and Pennzoil recognizing defendants' right to an accounting for royalty payments based on market value to be arrived at by the use of all comparable sales of gas including those in the intrastate market and remanded the case to the trial court for that purpose.[4] On the application of Shell and Pennzoil, we granted certiorari to review the correctness of that decision.[5]
We agree with the parties and the evidence indicates that the market value provisions in question refer to "current" market value. However, this court has not established a test for calculating the current market value of federally regulated natural gas.[6] In our review of the jurisprudence of other jurisdictions, we note that the Texas Supreme Court and the United States Court of Appeals, Fifth Circuit, have addressed this issue.
Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866 (Tex.1968), involved the determination of the market value of intrastate gas committed to a long-term contract. In *802 that case, the Texas Supreme Court held that a lessee could not escape its duty to pay royalties based on the market value of gas because of its failure to protect itself from rising prices. The court said that the market value of the "gas is to be determined by sales of gas comparable in time, quality, and availability to marketing outlets." However, that case involved only intrastate gas, not interstate gas. Later in Exxon Corp. v. Middleton, 613 S.W.2d 240 (Tex.1981), another case involving gas not sold in a regulated market, the court in discussing the nature of comparable sales used in determining market value held:
Sales comparable in quality are those of similar physical properties such as sweet, sour, or casinghead gas. Quality also involves the legal characteristics of the gas; that is, whether it is sold in a regulated or unregulated market or in one particular category of a regulated market. (Emphasis added.)
Subsequently, in First Nat. Bank in Weatherford v. Exxon Corp., 622 S.W.2d 80 (Tex. 1981), the question presented was the same as that in the case at bar, that is, whether gas sales in the intrastate market constituted comparable sales for the purpose of determining the value of gas dedicated to the interstate market. The Texas Supreme Court noted that while in Middleton it had not been called upon to determine the question of whether regulated interstate sales prices had any bearing on determining the market value of unregulated intrastate gas, it had stated that "intrastate and interstate gas prices are not comparable in quality. They are conceptually and legally different." The court, adhering to these statements, held
[i]ntrastate sales of gas are not comparable to interstate sales regulated by the Federal Power Commission.
In Kingery v. Continental Oil Co., 626 F.2d 1261 (5th Cir.1980), the Fifth Circuit was presented with similar facts and almost identical legal arguments as we are in the instant case. There, plaintiffs were royalty interest owners under mineral leases covering land located in Texas. Defendants were lessee-producers. The natural gas produced from the leasehold was transported and sold in interstate commerce under a certificate of convenience and necessity from the FPC. The natural gas had been irrevocably dedicated to the interstate market. The leases required the defendant-lessees to pay royalties based on the market value of the gas. In actual practice, the lessees paid royalties based on sales prices in the interstate market. The royalty owners contended, as here, that the market value of the gas was greater than the interstate sales prices. Suit was brought to recover the alleged deficiencies in royalty payments during the period in question. In resolving this issue, the court stated:
We are of the opinion that where the gas has been irrevocably dedicated to the interstate market, it follows inexorably that the only comparable sales to be used in determining the market value of such gas are sales on the interstate market. It likewise follows that sales on the intrastate market are not comparable in determining the market value of such gas.
We agree with the Texas Supreme Court and the Fifth Circuit in their resolution of the same issue presented for our determination in this case and hold that market value must be determined by comparable sales in quality which also involve the legal characteristics of the gas, that is, whether it is sold on a regulated or unregulated market. Intrastate and interstate gas are not comparable in quality. They are conceptually and legally different. In the instant case, it was not contested that Shell and Pennzoil obtained and paid royalties on the highest price allowed by the FPC for the particular category of gas sold to United Gas during the period in question. Hence, we reject the conclusion reached by the court of appeal that "the trial judge erred in failing to consider prices paid in the intrastate sales in order to determine the market value of the gas for computation of royalty payments due defendants."
Williams further argues that the parties to the leases never contemplated that the amount of the royalty would later be affected *803 by federal price regulations and therefore such regulations cannot alter the rights of the parties under the leases. They point out that the 1934 lease was executed before the passage of the Natural Gas Act of 1938 and that both leases were executed prior to the Phillips decision.
Legal agreements have the effects of law upon the parties; intent is to be determined by the words of the contract when clear and explicit and lead to no absurd consequences. La.Civ.Code art. 1945. There is no ambiguity here. Nonetheless, we will address the issue raised by Williams.
We believe that the United States Supreme Court has rejected this argument in California v. Southland Royalty Co., 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978). There, a lease was executed in 1925 prior to the regulation of gas on the interstate market. As in the instant case, the lease was silent as to the sale of gas on the interstate market. In 1951, the lessee entered into a contract to sell the gas to an interstate pipeline. After the Phillips decision, the lessee obtained a certificate of public convenience and necessity of unlimited duration. In 1973, the lessee entered into a second contract to sell additional volumes of gas to the interstate carrier. In 1975, when the lease expired by its terms, the owners of the mineral interests attempted to withdraw the gas from the interstate market in order to sell it on the higher, unregulated intrastate market. The FPC determined that the gas once dedicated to the interstate market could not be withdrawn without FPC authorization. In sustaining this determination, the Supreme Court stated in language equally applicable to the present case:
In any event, we perceive no unfairness in holding respondents, as lessors, responsible for continuation of the services until abandonment is obtained. Respondents were "mineral lease owners who entered into a lease that permitted the lease holders to make interstate sales...." They did not object when [the lessee] sought a certificate from the Commission. Indeed, as the Commission pointed out [the lessee] may have been under a duty to seek interstate purchasers for the gas.... Gas leases are typically construed to include a duty diligently to develop and market.... Having authorized [the lessee] to make interstate sales of gas, respondents could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market.
In the instant case, Shell and Pennzoil were under a duty to exercise reasonable diligence to secure a market for the gas that they had produced. See La.R.S. 31:122 (Comment 4 and cases cited therein). It is not contested that the decisions to market the gas to United Gas were prudently made and that the arms-length agreements executed in 1941 and 1944 as a result thereof were in the best interest of both the producers and the royalty owners. Williams was aware that Shell and Pennzoil (then Union) intended to sell the gas in the interstate market. There was no protest on its part and indeed the evidence indicates that the sales provided Williams a market for its gas in Gibson Field with its accompanying revenues which otherwise would not have been available. Shell and Pennzoil had authority under the leases to sell the gas in the interstate market. Williams could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed. The judgment of the district court is reinstated.
WATSON, J., concurs.
DENNIS, J., dissent with reasons.
LEMMON, J., dissents, noting that the natural gas at issue was dedicated to the interstate market and therefore subject to federal regulations only because of long term contracts to which the lessors were not parties.
DENNIS, J., dissenting.
I respectfully dissent.
*804 The majority today holds that a mineral lessee who dedicates natural gas under his lease to regulated interstate sales may fix his obligation to pay to his lessor a royalty based on the regulated "market rate" of the gas without regard to the price obtained for natural gas in unregulated intrastate sales. In so doing, the majority has effectively declared that regulated interstate gas sales constitute a separate market in themselves, with its "market rate" fixed at the regulated price. I disagree with this treatment of the regulated price ceiling as a "market rate." "Market value" is defined in our jurisprudence as the "price at which the owner of the goods or the producer holds them for sale; the price at which they are freely offered in the market to all the world...." Wall v. United Gas Public Service Co., 178 La. 908, 152 So.2d 561 (1934), citing Muser v. Magone, 155 U.S. 240, 15 S.Ct. 77, 39 L.Ed. 135. On the other hand, the regulated price for natural gas constitutes a utility rate which is designed to compensate the producer's actual costs of producing, gathering, transporting and marketing the natural gas, and afford him a fair return on his investment. Lightcap v. Mobil Oil Corp., 221 Kan. 448, 562 P.2d 1 (Kan.1977). See, e.g. Placid Oil Co. v. Federal Power Commission, 483 F.2d 880 (5 Cir.1973); Forest Oil Corporation v. Federal Power Commission, 263 F.2d 622 (5 Cir. 1959); City of Detroit, Michigan v. Federal Power Commission, 230 F.2d 810 (D.C.Cir. 1955). This rate does not purport to reflect the value of gas as determined in a market between willing buyers and sellers.
The fact that federal regulations restrict the price at which the lessees could have sold the gas in a free market should not change the meaning that a state court gives to "market rate" or the meaning that the parties undoubtedly gave to the term in 1934. Neither should the regulated price for interstate sales constitute an artificial market value for purposes of determining the lessor's royalty rights, since such rights were excluded from the ambit of interstate gas regulation. Mobil Oil Corp. v. Federal Power Commission, 463 F.2d 256 (D.C.Cir. 1972), cert. den. 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676. Instead, a mineral lessor's royalty rights are determined under state law. Id.
Under our state law, a contract has the effect of law between the parties, and courts are bound to give effect to the contract in accordance with the intent of the parties, which is determined by the clear and explicit words of the contract. La.Civ. Code art. 1945. The words of the contract are to be understood "in the common and usual signification." La.Civ.Code art. 1946. "When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent...." La.Civ.Code art. 1963.
I would have no objection to the result reached today had the majority examined the evidence and demonstrated warrant in the record for finding that the mineral lessor consented by word or deed to the calculation of his royalty interest according to the interstate regulated price. However, the majority fashions a rule that modifies a contractual relationship without regard for the parties' intentions, and which operates in this case to abrogate the parties' express intention to the contrary. When the parties executed the mineral lease in 1934, neither reasonably foresaw federal regulation of natural gas prices that began with the enactment of the Natural Gas Act of 1938, or the extension of such regulation to natural gas producers in Phillips Petroleum v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). Presumably, their choice of a royalty clause based on the "market rate" of the gas anticipated a continuation of a market in which the price is determined by the free interplay of supply and demand for the commodity. Furthermore, the parties' use of a "market rate" basis for royalties presumably reflects an awareness of our decision in Wall v. United Gas Public Service Co., supra, decided nine months prior to execution of the lease, in which we defined "market price" and "market value" as current prices received for goods sold in a free exchange. The record provides no convincing evidence that the mineral lessor subsequently assented to a modification of *805 the original agreement that the royalties would constitute a portion of the value received for gas in a free market.
I am unpersuaded by the lessee's protest that requiring it to pay royalties according to terms of the lease agreement would cause it substantial hardship since its revenues are based on the lower regulated price. Since a producer's royalty obligations are cost components of the rate structure, individual producers may petition to the Commission for special rate relief when escalating royalty costs that are tied to the unregulated gas price place them in an untenable financial position. Federal Energy Regulatory Comm. v. Pennzoil Producing, 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979). In such cases, the Commission is authorized to grant individual rate adjustments to compensate these producers for higher royalty costs, although the Commission is not required to guarantee a producer's profit margin in the face of rising royalty costs. Id.
Notwithstanding the possibility of such special rate relief, I would still resist this judicial tampering with the clear provisions of a contract. The fact that a party's performance under a contract becomes more onerous than anticipated does not justify a judicial alteration of the express contractual terms. Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819 (1949); Picard Constr. Co. v. Board of Commissioners, 161 La. 1002, 109 So. 816 (1926); Pratt v. McCoy, 128 La. 570, 54 So. 1012 (1911); Chemical Cleaning, Inc. v. Brindell-Bruno, Inc., 214 So.2d 215 (4 Cir.1968). I am disturbed by the majority's departure from this long-standing principle of free enterprise in this case.
NOTES
[1] Thus, we are not faced with the same issue presented to this court in Henry v. Ballard & Cordell Corp., 418 So.2d 1334 (La.1982), where defendants argued and this court agreed that the evidence indicated the parties intended that the market value provision referred to a "past" rather than a "current" market value.
[2] Subsequent releases of acreage by Shell prior to and after commencement of this suit have reduced Williams' acreage in the Gibson Field under lease to Shell to about 980 acres.
[3] In 1978, the Natural Gas Policy Act was passed which extended federal price regulation to intrastate sales of gas under the authority of the Federal Energy Regulatory Commission. 15 U.S.C. §§ 3312-3432.
[4] 411 So.2d 634 (La.App. 4th Cir.1982).
[5] 421 So.2d 904 (La.1982).
[6] Williams contends that this court's decision in Wall v. United Public Service, 178 La. 908, 152 So. 561 (1934) dictates that current market value is the value of the gas in the open (unregulated) market. Wall was not concerned with the market value of federally regulated gas and is not determinative of the issue presently before this court.