Frederick J. FREY, et al.,
Plaintiffs–Appellants,

v.

AMOCO PRODUCTION COMPANY,
Defendant–Appellee.

No. 90–3553.

United States Court of Appeals,
Fifth Circuit.

Oct. 7, 1991.

Frederick W. Ellis, Thomas C. McKowen, IV, Strain, Dennis, Ellis, Mayhall & Bates, David M. Ellison, Jr., Ellison & Smith, Baton Rouge, La., for plaintiffs-appellants.

Frank J. Peragine, Christina H. Belew, Simon, Peragine, Smith & Redfearn, New Orleans, La., for defendant-appellee.

Before REAVLEY, KING and JONES, Circuit Judges.

REAVLEY, Circuit Judge:

Frederick J. Frey and other gas royalty interest owners (collectively Frey) appeal from the district court's rulings that: (1) under the terms of the Louisiana gas lease at issue, take-or-pay payments received by the lessee under its gas sales contract are not part of the amount realized from the sale of gas; (2) royalty miscalculation claims based on royalties paid more than three years before suit are prescribed; and

(3) Amoco's status as unit operator of the Morganza field does not subject its records to Louisiana's Public Records Act. We hold that royalties are due on take-or-pay receipts under Frey's Louisiana gas lease and that the district court's prescription ruling is not supported by sufficient findings, but we agree with the court's decision regarding Louisiana's Public Records Act.

## I. BACKGROUND

Frey owns royalty interests under a mineral lease (the Lease) that covers part of the Morganza natural gas field in Louisiana. Amoco Production Co. (Amoco) prepared the Lease from a Bath Louisiana form and executed it in 1975 with Frey's predecessor-in-interest, F & L Planters (F & L). Amoco has produced and sold gas pursuant to the Lease since 1982.

The Lease provides Frey a "royalty on gas sold by Lessee [at] one-fifth (⅕) of the amount realized at the well from such sales." In 1981, Amoco agreed to sell the gas that it would produce under the Lease to Columbia Gas Transmission Corporation (Columbia). The contract between Amoco and Columbia (the Morganza Contract) contains a "take-or-pay" provision that requires Columbia to pay Amoco for a minimum amount of gas each year regardless of whether Columbia takes the minimum amount.

By July 1985, Amoco and Columbia were embroiled in litigation over approximately $265 million in take-or-pay liabilities that Amoco claimed under the Morganza Contract. Amoco and Columbia resolved their take-or-pay dispute in their Settlement Agreement. Under the Settlement Agreement, Columbia paid Amoco approximately $45.6 million as a "recoupable take-or-pay payment," meaning that over a five-year period, Columbia could take $45.6 million worth of gas over its minimum required annual purchase. Columbia also agreed to pay Amoco approximately $20.9 million as what Columbia and Amoco call a "nonrecoupable take-or-pay payment." Columbia cannot recoup this sum by taking extra gas. Finally, Columbia paid Amoco approximately $280.2 million under the Settlement Agreement for past and future price deficiencies in gas that Amoco delivered to Columbia under the Morganza Contract.

Amoco shared the $280.2 million with Frey under the Lease's gas royalty provision, but it did not similarly share the $66.5 million in take-or-pay settlement proceeds. Frey sued Amoco in April 1988, alleging that the Lease subjected Amoco's receipts of take-or-pay settlement payments to Frey's royalty interest and that Amoco made accounting mistakes which caused it to underpay Frey's royalty on the gas delivered to Columbia.

The district court granted Amoco partial summary judgment that the Lease does not entitle Frey to a royalty share of the take-or-pay amounts received by Amoco under the Settlement Agreement. *Frey v. Amoco Production Co.*, 708 F.Supp. 783, 787 (E.D.La.1989). At the close of Frey's case-in-chief during a bench trial, the district court ruled that Frey's royalty miscalculation claims pertaining to the period before April 18, 1985 are barred by Louisiana's three-year prescription statute. Frey and Amoco then settled all of their post-April 1985 accounting disputes. After trial, the court denied Frey's request for a declaratory judgment that Amoco is subject to Louisiana's Public Records Act. *Frey v. Amoco Production Co.*, 741 F.Supp. 601, 603 (E.D.La.1990). Frey challenges these three rulings.

## II. DISCUSSION

### A. ROYALTY ON TAKE-OR-PAY SETTLEMENT PROCEEDS

■■ The terms of a Louisiana mineral lease determine the obligations of its signatories. *See Odom v. Union Producing Co.*, 243 La. 48, 141 So.2d 649, 656 (1961). Frey and Amoco dispute whether payments received by Amoco under its take-or-pay contract with Columbia are part of the "amount realized" from gas sold by Amoco. On cross-motions for summary judgment, the district court interpreted the Lease's gas royalty clause as requiring Amoco to account to Frey only for receipts attributable to specific gas *production*.

The court considered the parties' contract dispute controlled by *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1168 (5th Cir.1988) and granted Amoco partial summary judgment that it owes Frey no royalty on take-or-pay monies received from Columbia. *Frey*, 708 F.Supp. at 787. We review *de novo* the court's interpretation of the Lease's legal effect. FED. R.CIV.P. 56; *USX Corp. v. Tanenbaum*, 868 F.2d 1455, 1457 (5th Cir.1989).

*1. Production and* Diamond Shamrock

■ In *Diamond Shamrock*, this court held that "production," as used in a mineral lease prepared by the Department of Interior, means the actual physical severance of minerals from the ground. *Diamond Shamrock*, 853 F.2d at 1168. This holding made gas royalties under the lease there at issue due only on gas actually produced and not on take-or-pay payments received by the lessee-producer from the pipeline-purchaser. *Id.*

Several facts distinguish *Diamond Shamrock* from this case. Foremost, the cases concern different lease language. In *Diamond Shamrock*, the lessor received as royalty a fraction of the "amount or value of *production* saved, removed, or sold" whereas Frey is entitled to a fraction "of the amount realized at the well from [the sale of gas]." *Compare Diamond Shamrock*, 853 F.2d at 1163 (emphasis added) *with Frey*, 708 F.Supp. at 786. Second, the *Diamond Shamrock* court applied federal law in determining the meaning of the Department of Interior leases there at issue, but we must predict how the Louisiana Supreme Court would allocate take-or-pay payments under the Lease. *See, e.g., Piney Woods Country Life School v. Shell*

*Oil Co.*, 905 F.2d 840, 851–52 (5th Cir.1990) (predicting that Mississippi Supreme Court would consider federal price ceilings in determining the meaning of "market value" in gas royalty contract). Finally, the Department of Interior as lessor wrote the *Diamond Shamrock* lease, while here, Amoco as lessee prepared the Lease and presented it to F & L for execution. So *Diamond Shamrock* does not control the result in this case.

The Lease's paragraph 7(b) establishes the royalty on gas sold by Lessee to be one-fifth (⅕) of the amount realized at the well from such sales.

The district court held that "a 'sale' of gas cannot occur absent physical production and severance of the gas." *Frey*, 708 F.Supp. at 786. Though the court cited authority for the proposition that in Louisiana, gas apart from the mineral estate cannot be *owned* by the buyer until it is produced, *see id.*, the court assumed that a thing must be owned to be sold.[1] However, under Louisiana law a

sale is sometimes made of a thing to come: as of what shall accrue from an estate, of animals yet unborn, or such like other things, although not yet existing.

LA.CIV.CODE ANN. art. 2450 (West 1952). More importantly, the court gives no explanation for why take-or-pay payments are not considered part of the total consideration for the right to take gas under the Morganza Contract.

The Lease affords royalty on the amount realized from sales, not on production. *Cf. Diamond Shamrock*, 853 F.2d at 1161; *Killam Oil Co. v. Bruni*, 806 S.W.2d 264,

---

1. We agree with the court that Louisiana law determines when a sale of minerals takes place. *See Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225, 234 (5th Cir.1984), *cert. denied*, 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985). But we think that Louisiana courts would treat Amoco's total compensation from Columbia as compensation to Amoco for the "sale" of gas regardless of whether the gas is produced, owned, or in existence. In *Henry v. Ballard & Cordell Corp.*, 418 So.2d 1334, 1338–41 (La.1982), the Louisiana Supreme Court expressly rejected the rule announced in *Texas Oil*

& *Gas Corp. v. Vela*, 429 S.W.2d 866, 871 (Tex. 1968) and held that the market *value* of gas is determined at the time that a gas sales contract is executed as opposed to when the gas is produced. *See also United Lands Co. v. Pan-American Prod. Co.*, 14 So.2d 84, 85 (La.Ct.App.1943) (per curiam) (oil "'sold' ... indicates the payment of a purchase price or the obligation to pay a purchase price"); *cf. Piney Woods*, 726 F.2d at 233–38 (that Mississippi would apply *Vela* supports Mississippi rule that gas not sold until produced).

266–67 (Tex.App.—San Antonio 1991, writ requested); *State v. Pennzoil Co.*, 752 P.2d 975, 976 (Wyo.1988) (no royalty on take-or-pay payments where leases explicitly tie royalty to production). This court before has held that take-or-pay arrangements can effect a "sale" of gas that brings take-or-pay arrangements within the jurisdiction of the Federal Power Commission despite the possibility that the producer may not deliver any gas pursuant to arrangement. *Callery Properties, Inc. v. Federal Power Comm'n*, 335 F.2d 1004, 1021 (5th Cir. 1964), *rev'd on other grounds*, 382 U.S. 223, 230, 86 S.Ct. 360, 364–65, 15 L.Ed.2d 284 (1965). That the Lease explicitly bases oil and miscellaneous mineral—but not gas—royalties on *production* strongly suggests that we not interpret production to be a prerequisite to royalties on gas.[2] *See* LA.CIV.CODE ANN. art. 2050 (West 1987) (each contractual provision must be interpreted in light of contract's other provisions).

Amoco contends that practical accounting difficulties should keep us from dividing recoupable take-or-pay payments between it and Frey. Amoco relies on the following *Diamond Shamrock* statement to support its argument:

[Requiring take-or-pay payments to be shared] would lead to absurd results. For example, if royalty is payable currently when the take-or-pay payment is made, what happens when the pipeline later takes make-up gas? If the fair market value of gas rises, the pipeline is usually responsible for paying for the make-up gas at the increased market value. The [lessor] gets its proportionate share of the increased market value as royalty for the make-up gas now taken. The lessee-producer then has to pay the additional royalty due on the increased fair market value, necessitating *two* royalty payments on *one* purchase of gas.

If the price of gas drops, depending on the contract, the pipeline-purchaser could be due a refund. If the pipeline gets a refund, then certainly it would be equitable for the lessee-producer to get a refund on overpaid royalties. A problem arises here with the length of the make-up period, usually 7 years, being longer than the statute of limitations [applicable to lessees' royalty refund claim]. In this situation, it is quite possible that the producers would never be able to recover overpaid royalties on take-or-pay payments.

*Diamond Shamrock*, 853 F.2d at 1166 (footnotes omitted). If the Lease language and Louisiana law require Frey to share in take-or-pay payments, we could not hold otherwise simply because Amoco could have to send two checks to Frey instead of one if the market value of gas rises when Columbia takes it.[3]

**2.** The Lease's royalty clause provides:

7. Subject to the provisions of Paragraphs 2 and 10 hereof the royalties to be paid by Lessee are: (a) *on oil* (which includes condensate and other liquid hydrocarbons when separated by lease separator units), one-fifth (⅕) of that *produced and saved from the land* and not used for fuel in conducting operations on the property (or on acreage pooled therewith or with any part thereof), or in treating such liquids to make them marketable; (b) on gas, one-fifth (⅕) of the market value at the well of the gas used by Lessee in operations not connected with the land leased or any pooled unit containing all or a part of said land; the royalty on gas sold by Lessee to be one-fifth (⅕) of the *amount realized at the well from such sales;* (c) one-fifth (⅕) of the market value at the mouth of the well of gas used by Lessee in manufacturing gasoline or other by-products, except that in computing such value, there shall be excluded all gas or compo-

nents thereof used in lease or unit operations, or injected into subsurface strata as hereinafter provided; (d) One Dollar ($1.00) for each ton of 2240 pounds of sulphur, payable when marketed; and (e) one-fifth (⅕) of the market value at the well or mine of all other minerals *produced and saved or mined and marketed.*

Lease ¶ 7 (emphasis added).

**3.** The first check would represent Frey's royalty share of the take-or-pay payment and the second would represent Frey's royalty share of the difference between the gas' market value when Columbia took it and its market value when Columbia submitted its take-or-pay payment. We do not read *Diamond Shamrock* to countenance the possibility that a royalty owner could demand a royalty share of the gas' full market value both when Columbia submits its take-or-pay payment and when it takes the gas and pays Amoco a market price differential.

On the facts of this case, we reject the possibility that a drop in market demand and price between the time that a pipeline submits a take-or-pay payment and recoups the gas could necessitate a refund from the lessor who shares in take-or-pay payments. Columbia paid Amoco approximately $45.6 million as a recoupable take-or-pay payment under the Settlement Agreement and in exchange, was allowed to take $45.6 million worth of gas over five years. The Settlement Agreement establishes the price for each thousand cubic feet (MCF) of gas recouped by Columbia during this period, so here the volume of gas taken, not the price paid, varied with market price over the make-up period. Thus, no refund from Frey could have been necessary under the Settlement Agreement.[4]

We notice another argument worth consideration, but not raised by Amoco. The words "amount realized *at the well* from [gas] sales" could indicate that Amoco and F & L understood that Amoco would pay royalties only on amounts it received for gas physically present "at the well" and that gas could only be present at the well during production. But, again, the Lease demonstrates that Amoco knew how to make royalties explicitly dependent on production but did not do so. Rather than inferring a production requirement from the Lease's "at the well" language, we interpret this term-of-art according to its "received meaning" in the oil and gas industry. *Kavanaugh v. Berkett,* 407 So.2d 645, 647 (La.1981); *see also* La.Civ.Code Ann. art. 2047 (West 1987) ("Words of art and technical terms must be given their technical meaning when the contract involves a technical matter."). Before "at the well" became widely used in gas leases, Louisiana courts held that the value of gas was to be determined at the well absent a lease provision to the contrary. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 622, 64 S.Ct. 724, 726, 88 L.Ed. 967 (1944). Later, to allocate refining and transportation costs among the lessor and lessee, parties specified the place at which gas is to be valued for royalty purposes. *See Merritt v. Southwestern Elec. Power Co.,* 499 So.2d 210, 214 (La.Ct.App.1986). When we questioned Amoco's counsel about the significance of the term "at the well" during oral argument, he did not contend that this language did anything other than allocate gas transportation and marketing costs between Amoco and F & L.

### 2. Cooperative Ventures and Louisiana Law

Because Amoco and F & L did not specifically address whether take-or-pay

---

4. Even if a refund were possible on other facts, we know of no authority for the proposition that accounting complications should abrogate legal rights. In stating that a *possible* inequity could result if the gas market demand and price decreases during the make-up term but after the statute of limitations runs for royalty overpayments, the *Diamond Shamrock* court relied on a federal administrative statute of limitations not at issue here. *See Diamond Shamrock,* 853 F.2d at 1166 n. 31 (citing 43 U.S.C. § 1339: government-lessor administrative refunds of excess royalty payments allowed only if refund request filed within two years after payment made). Moreover, the *Diamond Shamrock* court cited no cases so strictly construing section 1339, and even recognized that "the precise requirements for refund requests are still unclear." *Id.* Indeed, the Federal Circuit Court of Appeals has already construed section 1339 in accordance with other limitations statutes to commence running only after "claimants know or should know of their potential claims." *Chevron U.S.A., Inc. v. United States,* 923 F.2d 830, 834 (Fed.Cir.1991). So we do not share the *Diamond Shamrock* court's concerns about potential inequities arising from a royalty owner's right to share in recoupable take-or-pay payments.

One commentator foresees shared take-or-pay accounting problems even more complicated than those considered by the *Diamond Shamrock* court. To keep its pipeline-purchaser out of bankruptcy, a gas producer could agree to accept transportation of gas for direct sale by the producer to an end-user in lieu of the pipeline's take-or-pay volume obligations. *See* William H. White, *The Right To Recover Royalties on Natural Gas Take–Or–Pay Settlements,* 41 Okla.L.Rev. 663, 670 (1988). If the producer must share take-or-pay payments with the lessor and we assume that the producer acted in everyone's best interest by executing the settlement, questions regarding what the lessor receives under the settlement may have to be litigated. *Id.* Even on these facts, though, we would not allow the complicated nature of a settlement between a pipeline and a producer to compromise the rights of the third-party lessee.

payments are part of the amount realized from the sale of gas and because the Lease does not base gas royalties on production, we interpret the Lease's gas royalty clause in a manner consistent with the Lease's object and nature. LA.CIV.CODE ANN. arts. 2048, 2053 (West 1987); *Henry v. Ballard & Cordell Corp.*, 418 So.2d 1334, 1339 (La. 1982). We glean the nature and objective of a gas lease from Louisiana's Supreme Court:

> Where the mineral lease provides for payment to the lessor of a fractional royalty interest, the lease arrangement is in the nature of a *cooperative venture:* the lessor contributes the land and the lessee the capital and expertise necessary to develop the minerals *for the mutual benefit of both parties* ....
>
> ... The ultimate objective of the royalty provisions of a lease is to fix the division between the lessor and lessee of the *economic benefits anticipated from the development of the minerals.*

*Id.* at 1338 (emphasis added). The court cites with approval Professor Harrell's statement that

> any determination of the market value of gas which ... permits either the lessor or lessee to receive a part of the *gross revenues from the property* greater than the fractional division contemplated by the lease, should be considered inherently contrary to the basic nature of the lease and be sustained only in the clearest of cases.

*Id.*, at 1338 n. 10, quoting Harrell, *Developments in Non Regulatory Oil & Gas Law*, The 30th Annual Institute on Oil & Gas Law & Taxation, Southwestern Legal Foundation, 336 (1979) (emphasis added).

We think that Louisiana's Supreme Court would hold take-or-pay payments to be part of the "amount realized" from the sale of gas under the Lease. Amoco secured the right to take-or-pay payments only by executing a contract to sell the gas that Amoco acquired pursuant to the Lease. The payments, like the market price paid for gas taken, constitute economic benefits that Amoco received from granting Columbia the right to take gas from the leased premises, a right that Amoco got through the Lease.[5] It would be contrary to the nature of the lease as a cooperative venture to allow a benefit by any name that is attributable to the gas under the leased premises to inure exclusively to the lessee.[6]

---

5. We recognize that our statement of why Columbia gave Amoco take-or-pay monies may contradict *Diamond Shamrock's* assertion that "take-or-pay payments are payment for the pipeline-purchaser's *failure* to purchase ... gas." 853 F.2d at 1167. But even if *Diamond Shamrock's* rationale depends on this statement of take-or-pay-clause purpose, nothing supports the argument that the *Diamond Shamrock* court intended to or could have established the purpose of take-or-pay clauses for all those who come before this court.

It is wholly unrealistic to think that one would pay to not take gas outside the context of a gas sales contract securing the right to certain reserves. In that the "payments to not take gas" are *only* ancillary to the right to take gas, we believe, in accordance with Louisiana jurisprudence, that they are an economic benefit attributable to the sale of gas under the Lease and therefore subject to royalty. Our characterization of the payments as economic benefits from the Lease instead of part of the price of any gas taken under the Lease avoids the theoretical problem of attribution when no gas is taken under a lease. *See id.* at 1166–67.

6. A commentator posits two economic benefits from a gas lease that he claims are legitimately enjoyed by the lessee to the exclusion of the lessor. White, *The Right To Recover Royalties on Natural Gas Take–Or–Pay Settlements*, 41 OKLA.L.REV. at 673. We refute his assertions to bolster and further define our conclusion as to the sharing of all economic benefits.

White explains his first example of a shared economic benefit:

> A longer term contract shifts the risk of future market price decreases to the pipeline and future market price increases to the producer. Similarly, a commitment to take a larger amount of gas shifts the risk to the pipeline. Yet the producer is not obligated to pay royalties on these economic aspects of the contract. No court has held that royalties are computed on a value based on the contract length or the volume of takes required.

*Id.* But while the producer is not required to pay royalties on economic benefits derived from the purchase contract term and volume specifications *per se*, the lessor effectively shares in these benefits. For example, if a producer negotiates a short-term, fixed-price contract in a gas market where demand and price are rising, the lessor receives a royalty share of both the price negotiated by the producer under the short-term contract *and* the presumably higher

Although Louisiana courts have not decided the take-or-pay question presented by this case, our interpretation of the Lease accords with several aspects of Louisiana mineral jurisprudence in addition to *Henry.* In Louisiana,

> [a] mineral lessee ... is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator *for the mutual benefit of himself and his lessor.*

LA.REV.STAT.ANN. § 31:122 (West 1989) (emphasis added). This statute obligates Amoco to exercise reasonable diligence to secure a market for gas that it discovers under leased property. *See Shell Oil Co. v. Williams, Inc.,* 428 So.2d 798, 803 (La. 1983).

If lessors did not share in take-or-pay payments, lessees would have an incentive to compromise volume gas prices under their contracts or settlements with pipelines in exchange for favorable take-or-pay terms. White, *The Right To Recover Royalties on Natural Gas Take–Or–Pay Settlements,* 41 OKLA.L.REV. at 670–72; Comment, *Royalty on Take-or-Pay Payments and Related Considerations Accruing to Producers,* 27 HOUSTON L.REV. 105, 134 n. 225 (1990); *see also Amoco Production Co. v. First Baptist Church of Pyote,* 579 S.W.2d 280, 287 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.) (lessee who compromises volume gas price for benefits that did not accrue to lessors is accountable to lessors). No law or typical lease term assures royalty owners of representation in negotiations between lessees and pipelines; Frey was not represented in negotiations between Amoco and Columbia. Given the duty imposed on lessees by R.S. 31:122, we will not countenance a conflict-of-interest in

a lease as to marketing strategy, especially where the lease's language is equivocal or supports a reading that does not countenance a conflict.

The Louisiana Supreme Court's decision in *Wemple v. Producers' Oil Co.,* 145 La. 1031, 83 So. 232 (1919) also supports our interpretation of the Lease. The lease at issue in *Wemple* provided a royalty of one-eighth of oil saved and produced and $200 per well per year for gas if any is used off of the leased premises. After the *Wemple* lease's execution, the lessee became aware of and employed a new oil production technology that indisputably produced more oil than any other available process. The new pumping method also efficiently drew casinghead gas from the well, which the lessee condensed to produce natural gasoline, a product not addressed in the *Wemple* lease. The lessee cited its right to produce oil under the lease and the efficiency of its chosen method in contending that it owned all rights to the natural gasoline by-product of its production process. The *Wemple* court disagreed. It applied equity principles to decide that the lessor cannot be presumed to have given away a valuable right arising from the leased premises for nothing in return and that both the lessor and "the owner [are] entitled to be benefited" by the lucrative, new production technology not addressed in the lease. *Id.* at 1045–48, 83 So. at 237–38; *see also* LA.CIV. CODE ANN. arts. 2053, 2055 (West 1987) (vague contracts subject to equitable interpretation).

If not covered by the Lease's "amount realized" language, take-or-pay payments, like the casinghead gas at issue in *Wemple,* would constitute a benefit derived from the leased premises that the parties did not explicitly allocate in the Lease, but which

price obtainable under the next contract. By our reasoning, the lessee does the lessor's bidding and shares with the lessor *any* bargain that it reaches with the pipeline.

White's next example concerns when "the lessee pledges the profits on future production as collateral for a loan. While the producer is obtaining economic value from the gas, it is under no obligation to pay a royalty on the net improvement of its credit position." *Id.* But the only collateral that the producer may legit-

imately pledge is *its* interest in a gas lease, so its credit position is improved only that amount. Because this economic benefit is attributable exclusively to the producer's interest in the lease, the lessor can expect no royalties on this benefit. Take-or-pay payments are not similarly attributable exclusively to the producer's interest because they stem from the pipeline's right to take gas, the value of which must be shared between the lessor and lessee.

Amoco would inequitably keep for itself. Finally, our interpretation of the Lease against Amoco accords with LA.CIV.CODE ANN. art. 2056 (West 1987): "[i]n case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text."

We reverse the district court's summary judgment for Amoco on take-or-pay issues and hold that the plaintiffs are entitled to their share of one-fifth of all take-or-pay payments received by Amoco that are attributable to the leased premises. On remand, the district court will calculate the amounts due.

### B. PRESCRIPTION ON ROYALTY MISCALCULATION CLAIMS

Frey also sued Amoco for miscellaneous royalty underpayments that are independent of take-or-pay payments. In Louisiana, claims for royalty underpayment are subject to a three-year liberative prescription (effectively a statute of limitations) that "commences to run from the day payment is exigible."[7] LA.CIV.CODE ANN. arts. 3494(5), 3495 (West Supp.1991). At the close of Frey's case-in-chief, the district court held that Frey's claims for royalty miscalculations that occurred more than three years before Frey filed suit in April 1988 are time-barred. Frey appeals the court's involuntary dismissal of his pre-April 1985 royalty miscalculation claims. See FED.R.CIV.P. 41.

It is undisputed that payment is demandable under article 3495 upon receipt of a royalty check. We need only determine whether Louisiana's doctrine of *contra non valentem agere nulla currit praescriptio*[8] operates to shift the beginning of the three-year statutory prescriptive period

from the time that the plaintiffs received their royalty checks to a later date. Despite the mandate of article 3495 as to the beginning of the three-year prescriptive period, Louisiana courts apply the *contra non valentem* doctrine to suspend the period's beginning while the cause of action is not knowable by the plaintiff through the exercise of reasonable diligence. *Edmundson v. Amoco Production Co.*, 924 F.2d 79, 83–84 (5th Cir.1991) (citing cases); *see also Plaquemines Parish Comm'n Council v. Delta Development Co.*, 502 So.2d 1034, 1055–56 (La.1987) (*contra non valentem* still viable exception to prescription statutes in Louisiana).

As "the basis for the court's ruling," the district court stated, "that which is knowable and easily obtainable by parties is not to be a basis for suspending the running of prescription." We must take this statement in concert with the time-bar date chosen by the court to mean that at the time the plaintiffs received their royalty checks and statements each month, they had enough information to enable them, through the exercise of reasonable diligence, to discover that they had a cause of action against Amoco for royalty miscalculation. The court did not issue findings of fact to support its conclusion as required under Federal Rule of Civil Procedure 41, and we have difficulty discerning any support in the evidence for that conclusion.

Under Louisiana law, the three-year prescriptive period did not begin to run on Frey's royalty miscalculation claim until the plaintiffs could have known through the exercise of reasonable diligence that they had such a cause of action against Amoco.[9] Perhaps the district court decided that the plaintiffs, through the exercise of reasonable diligence, could have known of

---

7. "Exigible" is synonymous with "requireable" and "demandable." Webster's Third New International Dictionary of the English Language Unabridged 796 (1968).

8. This Latinism means that "no prescription runs against a person unable to bring an action." *Ayo v. Johns–Manville Sales Corp.*, 771 F.2d 902, 907 (5th Cir.1985).

9. The parties wasted considerable time discussing the significance of demand letters sent from

Frey's counsel to Amoco. But the earliest of these letters was dated February 7, 1986, so they only go to prove whether by this date, Frey could have known of his cause of action through the exercise of reasonable diligence. Frey filed suit in April 1988, within three years of sending the first demand letter, so the letters cannot help Amoco prove that Frey could have reasonably known of the royalty miscalculations prior to April 1985.

the royalty miscalculations by examining their royalty check stubs each month. Amoco attaches documentation to its royalty checks that contains all of the information required by Louisiana's royalty disclosure statute.[10] Amoco also periodically sent the plaintiffs booklets explaining the significance of the numbers on their royalty check stubs and inviting questions about royalty calculations. But Louisiana law does not guarantee Amoco that it will not be sued for royalty underpayments more than three years after the payments have been accepted. If the royalty check stub contains an internal inconsistency cognizable from the face of the document, then it may be held that the stub's recipient could have reasonably known of a cause of action from the date of receipt. But if the stub simply understates the volume of gas produced from a well, its recipient need not call for an audit of the well's production each month to preserve the right to sue for royalty underpayment. It is not until the royalty owner has reason to suspect an understatement that the duty to investigate further arises.

To properly apply Louisiana law on *contra non valentem*, the district court must consider when Frey first had cause to suspect royalty miscalculations by Amoco, either from internal inconsistencies shown on check stubs, rumors, or otherwise. Frey's royalty miscalculation claims concern tax rebates that Amoco received from Columbia free of Frey's royalty interest, accounting for gas balancing among the working interests in the Morganza field, gas used by Amoco but not paid for, and unaccounted for price differentials based on the energy content of volumes of gas sold. We do not understand from our reading of the trial transcript, and the district court does not explain, how the plaintiffs could have known of these occurrences simply by reading their royalty check stubs. Absent suspicion of Amoco, the plaintiffs had no reason to request further information from Amoco when and if they received internally consistent explanations of their royalty receipts.

We reverse the district court's judgment based upon its ruling on prescription against the Frey claim for royalty miscalculations and direct the court to reconsider the issue in light of this opinion on remand.

■ Frey also claims that prescription was suspended under *contra non valentem* for the entire time that Amoco refused to supply requested well-accounting information. While prescription is suspended in Louisiana when a defendant acts to prevent a plaintiff from discovering a cause of action, *Edmundson*, 924 F.2d at 82, Amoco did not so act in this case. Amoco merely asserted its right to keep its information confidential, and this alone is insufficient to suspend prescription. *Id.* at 82–83. Absent voluntary disclosure, Frey may only get information from Amoco by asserting a statutory or contractual right, including the right to discovery in a lawsuit.

## C.  LOUISIANA PUBLIC RECORDS ACT

■ Frey asserts a substantive statutory right to all of Amoco's Morganza records

---

10. Louisiana's royalty disclosure statute requires that

[w]henever payment is made for oil or gas production to an interest owner, whether pursuant to a division order, lease, servitude, or other agreement, all of the following information shall be included on the check stub or on an attachment to the form of payment, unless the information is otherwise provided on a regular basis:

(1) Lease identification number, if any, or reference to appropriate agreement with identification of the well or unit from which production is attributed.

(2) Month and year of sales or purchases included in the payment.

(3) Total barrels of crude oil or MCF of gas purchased.

(4) Owner's final realizable price per barrel or MCF.

(5) Total amount of severance and other production taxes, with the exception of windfall profit tax.

(6) Net value of total sales from the property after taxes are deducted.

(7) Interest owner's interest, expressed as a decimal fraction, in production from (1) above.

(8) Interest owner's share of the total value of sales prior to any tax deductions.

(9) Interest owner's share of the sales value less his share of the production and severance taxes, as applicable.

LA.REV.STAT. ANN. § 31:212.31(B) (West 1989).

under Louisiana's Public Records Act, LA. REV.STAT. ANN. § 44:1(A)(2) (West 1982). Frey's claim is based on the fact that the Louisiana Conservation Commission unitized the Morganza field in 1982 and appointed Amoco as field operator. The district court interpreted the Public Records Act as excluding Amoco's Morganza records from its definition of "public record."[11] 741 F.Supp. at 602–03. We agree.

The purpose of the Public Records Act is to foster "the inherent right of the public to be reasonably informed as to the manner, basis, and reasons upon which governmental affairs are conducted." *Trahan v. Larivee*, 365 So.2d 294, 298 (La.Ct.App. 1978). Regardless of how many lessors' interests are affected and how much money is involved in a unitization, the decision to unitize and the choice of a unit operator affect only private individuals and corporations.

Only in *Lewis v. Spurney*, 456 So.2d 206 (La.Ct.App.1984) did a court mandate disclosure from a private entity under Louisiana's Public Records Act. The court permitted a newspaper to access the records of a corporation that received $25 million in state funds to promote the world's fair. But the court restricted access to records concerning expenditure of the public's funds, stating that "[t]he public is entitled to see exactly where all this money has been spent." *Id.* at 208. The court emphasized that the public nature of the records required its decision regardless of the private nature of the entity maintaining the records. *Id.* at 207.

Because Amoco's Morganza field records bear no similar or discernable public nature, the district court properly held that they are not public records under R.S. 44:1(A)(2).

## III. CONCLUSION

We REVERSE the district court's judgment because of the rulings on take-or-pay

issues and prescription. The decision denying Public Records Act coverage of Amoco's records is upheld. We REMAND the case for further proceedings consistent with this opinion.

REVERSED and REMANDED.

EDITH H. JONES, Circuit Judge, concurring:

I join in the judgment rendered on the facts of this case for three reasons. First, we are not attempting to overrule the *Diamond Shamrock* case, whose outcome depended upon a standard production-type royalty clause. We could not do so; for it follows from our rule that one panel of the circuit may not overrule a prior panel that a later decision in conflict with the previous, controlling authority is not precedent. *See Umphlet v. Connick*, 815 F.2d 1061, 1063 (5th Cir.1987).

Second, this opinion recognizes that the question of lessors' royalty entitlements to take-or-pay proceeds or settlements is initially resolved by construction of the particular lease under applicable state law. *See 1* E. Smith & J. Weaver, Texas Law of Oil & Gas 209 *et seq.* (Supp.1991). *Compare Killam Oil Co. v. Bruni*, 806 S.W.2d 264 (Tex.App.—San Ant.1991, *writ denied*) (adopting *Diamond Shamrock*); *State v. Pennzoil Co.*, 752 P.2d 975 (Wyo.1988) (adopting *Diamond Shamrock*). This case does not favor any general presumption that lessors must share in such proceeds, nor does its rationale pertain to other types of settlement clauses in the resolution of producer-pipeline take-or-pay disputes, such as contract price buy-down agreements; releases or reduction of minimum "take" quantities; or blanket settlements covering multiple leases and perhaps different lessors. In some jurisdictions, the implied covenant to market may support a lessor's claim to share in take-or-pay settlements of various types, but there are

11. LA.REV.STAT ANN. § 44:1(A)(2) (West 1982) provides that

    [a]ll books, records, [etc.] ... having been used, ... in the conduct, ... of any business, transaction, work, duty, or function which

was conducted, ... by or under the authority of the constitution or laws of this state, ... or order of any public body ... are "public records," ...

substantial economic arguments against lessors' receiving a simple pro rata share of such settlements. *See, e.g.,* Herrmann, Royalty on Gas Contract Settlements: the Other Shoe Falls, 4 Texas Oil & Gas J. 61 (1990); Comment, Royalty on Take-or-Pay Payments and Related Consideration Accruing to Producers, 27 Hou.L.Rev. 105 (1990). Our case does not reach such issues.

Third, the opinion states that if, pursuant to a make-up clause in the settlement, a pipeline later took gas at a *higher* market value than the one on which take-or-pay proceeds were based, the lessor entitled to share in such proceeds should receive two checks, one of which would reimburse for the differences between its original share and the higher market value. *See* n. 3, *supra.* I agree. The necessary corollary to this understanding should also be explicitly stated, however; if the market value *falls* from the time of the settlement to the time that sales are made up pursuant to the settlement, the lessor must be prepared to reimburse the producer or accept an offset to his royalty for that difference. Better yet, a court could tailor its judgment to protect the producer from the danger of over-paying take-or-pay settlement proceeds.